Argued 9 January, decided 20 February, rehearing denied 27 March, 1905.

### STATE v. GUGLIELMO.

79 Pac. 577, 80 Pac. 103.

DUE PROCESS OF LAW—NECESSITY OF INDICTMENT—VALIDITY OF ACCU-
SATION BY INFORMATION WITHOUT GRAND JURY.

1. The statute permitting district attorneys to file informations charging crimes (B. & C. Comp. §§ 1258-1264), but reserving to circuit judges the discretionary right to call grand juries, is not unconstitutional under Const. U. S. Amend. XIV, prohibiting the deprivation of liberty without due process of law, nor under Const. Or. Art. VII, § 18, providing for the selection or abolishment of grand juries.

NECESSITY OF INFORMATION BEING UNDER OATH.

2. An indictment or information in the form set forth in the statute, B. & C. Comp. § 1304, is sufficient, though it does not purport to be under oath, as both the grand jury and the district attorney are required to perform their duties under their oaths of office, and presumably their duties were so discharged: B. & C. Comp. § 788, subd. 15.

JUDICIAL NOTICE OF APPOINTMENT AND POWER OF DEPUTY DISTRICT
ATTORNEY—VERIFICATION OF INFORMATION.

3. Courts will take judicial notice of the appointment and scope of authority of their officers, including deputies; thus: Where it appears in a criminal case that the information has been prepared and filed by a deputy district attorney, the court will take notice of the official position of the deputy and of his authority, so that proof is not necessary on either point.

EFFECT OF MOTION TO SET ASIDE INFORMATION.

4. A motion to set aside a criminal information on the ground that it was not found, indorsed, or presented as required by law was insufficient to challenge the appointment of the deputy district attorney who prepared and filed the information.

INFORMATION—IMPLIED OATH.

5. An information prepared and filed by a deputy district attorney is in effect the act of the district attorney himself and therefore performed under oath, though the deputy is not a sworn officer, particularly where the principal officer calls the case for trial on the information so filed.

PROSECUTION BY INFORMATION IS DUE PROCESS OF LAW.

6. A prosecution for a felony by an information constitutes due process of law as that term is used in the Fourteenth Amendment to the Constitution of the United States.

POWER OF DISTRICT ATTORNEY TO FILE INFORMATION.

7. A district attorney in Oregon has power to file informations for both misdemeanors and felonies without permission of court, acting upon his own initiative, as did the attorney general of England under the common law; but here the authority is derived directly from the statutes, and not from the common law.

INFORMATION—REQUIREMENT OF SUPPORT OF OATH.

8. An information is supported by oath, as required by the Fourth Amendment to the Constitution of the United States, and Article IX of the Bill of Rights of Oregon, since it is filed by the district attorney, who is an officer acting under an official oath, performing the duties formerly devolving on a grand jury.

INFORMATION—RATIFICATION OF SIGNATURE MADE BY DEPUTY.

9. A district attorney, having assisted in prosecuting accused, and being present when he was arraigned, and having secured an extension of time within which to plead, adopted and ratified the signing of his name to the information by another.

From Multnomah: JOHN B. CLELAND, Judge.

Frank Guglielmo was convicted of murder in the first degree and appeals.                    AFFIRMED.

For appellant there was a brief over the names of *Daniel Raphael Murphy, John Francis Logan* and *Ralph Elmo Moody,* with an oral argument by *Mr. Murphy* and *Mr. Moody.*

For the State there was a brief and an oral argument by *Mr. Andrew Murray Crawford,* Attorney General, and *Mr. John Manning,* District Attorney.

MR. JUSTICE MOORE delivered the opinion of the court.

The defendant, Frank Guglielmo, was informed against, tried, and convicted of the crime of murder in the first degree, alleged to have been committed in Multnomah County June 14, 1904, by killing one Freda Guarascia, and from the judgment which followed he appeals.

1. It is insisted by his counsel that the court erred in denying their motion to set aside the information on the ground that it violated the Fourteenth Amendment of the Constitution of the United States, and was also repugnant to Section 18 of Article VII of that of this State. It is argued that these sections of organic law guarantee to every suspected person the right to be charged by indictment found and returned by a grand jury, before he can be required to plead; that, though our state constitution authorizes the legislature to "modify or abolish" grand

juries, it must do so either by increasing or diminishing the number of "the most competent of the permanent citizens of the county" of which that body is composed (*State* v. *Lawrence,* 12 Or. 297, 7 Pac. 116; *Zabriskie* v. *Hackensack, etc., Ry. Co.* 18 N. J. Eq. 178, 90 Am. Dec. 617), or by totally abrogating the system; that the act of February 17, 1899 (B. & C. Comp. §§ 1258-1264), empowering the trial court to convene a grand jury, demonstrates that such inquisitorial body has not been abolished, nor has it been modified, for the authority attempted to be conferred by that act upon the district attorney to charge the commission of crimes by information only is the substitution of a single person, not chosen in the manner prescribed by the fundamental law of this State for the selection of grand jurors. This question was duly considered in the case of *State* v. *Tucker,* 36 Or. 291 (61 Pac. 894, 51 L. R. A. 246), and decided adversely to the defendant's contention; and, believing that the conclusion there reached is supported by reason and authority, we adhere to and reaffirm the legal principles thus announced: *Hurtado* v. *California,* 110 U. S. 516 (4 Sup. Ct. 292, 28 L. Ed. 232) ; *Bolln* v. *Nebraska,* 176 U. S. 83 (20 Sup. Ct. 287, 44 L. Ed. 382). In the case *In re Boulter,* 5 Wyo. 329 (40 Pac. 520), Mr. Chief Justice GROESBECK, in a very able opinion, answers the questions presented by defendant's counsel on this branch of the case, and shows that the doctrine contended for herein is without merit.

2. The defendant, never having had or waived a preliminary examination, was charged with the commission of the alleged crime by an information not sworn to by any person, upon filing which the court ordered a bench warrant to be issued for his arrest, though he was then in custody; having been apprehended for the crime with the commission of which he was charged. It is maintained by his counsel that this warrant was issued without probable cause, because it was not supported by oath or affirmation, and that an error was committed in overruling the motion to set aside the information, based on the ground that it violated Section 9 of Article I of the constitution of this State, prohibiting the issuing of warrants for the arrest of any person, except upon probable cause, supported by oath or affirmation. At common law the commission of crimes was charged either by indictment

or information, depending in most instances upon the grade of the offense. An indictment was an accusation at the suit of the sovereign, based on the oath of 12 men of the county wherein the offense was committed: 2 Hawk. P. C. 287. The form usually prescribed for the commencement of an indictment was, after stating the venue, as follows: "The jurors for our lady the Queen upon their oath present," etc.: 1 Archbold, Crim. Pr. & Pl. *76. Sir Matthew Hale, in speaking of the caption of a written accusation, and of the necessity of stating therein the oath of the jurors, says: "It must return that the indictment was made per sacramentum": 2 Hale's P. C. 167. The form of indictment prescribed by the legislative assembly of this State omits a recital of the oath of the grand jurors: B. & C. Comp. § 1304. Before the grand jury can enter upon the discharge of their duties, however, an oath is required to be administered to them, the form of which is also ordained: B. & C. Comp. § 1271. It has been repeatedly held in this State that the form of indictment given in the statute was sufficient: *State* v. *Dodson,* 4 Or. 64; *State* v. *Spencer,* 6 Or. 152; *State* v. *Brown,* 7 Or. 186; *State* v. *Lee Yan Yan,* 10 Or. 365; *State* v. *Ah Lee,* 18 Or. 540 (23 Pac. 424). In civil actions it is unnecessary to allege a fact which the law will presume: Bliss, Code Pl. (3 ed.), § 175. It will be presumed that official duty has been regularly performed (B. & C. Comp. § 788, subd. 15) ; and hence, arguendo, it would seem that an indictment complying with the form recommended by the legislative assembly, though omitting a recital therein of the oath of the grand jurors, was sufficient.

At common law an information was a surmise or suggestion upon record, made on behalf of the sovereign to a court of criminal jurisdiction, charging a person with the commission of a misdemeanor: *Wilkes* v. *The King,* 6 Brown, Parl. Cases, 345 ; *United States* v. *Tureaud* (C. C.), 20 Fed. 621. "Informations," says a text-writer, referring to such accusations made under the ancient rule, "are of two kinds: First, such as are merely at the suit of the King; secondly, such as are partly at the suit of the King, and partly at the suit of the party": 2 Hawk. P. C. 356. Blackstone, speaking of criminal informations, in distinguishing the two kinds, exhibited in the name of the King, says:

"First, those which are truly and properly his own suits, and filed ex officio by his own immediate officer, the attorney general; secondly, those in which, though the King is the nominal prosecutor, yet it is at the relation of some private person or common informer; and they are filed by the King's coroner and attorney in the Court of King's Bench, usually called the 'Master of the Crown Office,' who is for this purpose the standing officer of the public. The objects of the King's own prosecutions, filed ex officio by his own attorney general, are properly such enormous misdemeanors as peculiarly tend to disturb or endanger his government, or to molest or affront him in the regular discharge of his royal functions. For offenses so high and dangerous, in the punishment or prevention of which a moment's delay would be fatal, the law has given to the crown the power of immediate prosecution, without waiting for any previous application to any other tribunal, which power, thus necessary not only to the ease and safety, but even to the very existence, of the executive magistrate, was originally reserved in the great plan of the English constitution, wherein provision is wisely made for the due preservation of all its parts. The objects of the other species of informations filed by the master of the crown office upon the complaint or relation of a private subject are any gross and notorious misdemeanors, riots, batteries, libels, and other immoralities of any atrocious kind, not peculiarly tending to disturb the government (for those are left to the care of the attorney general), but which, on account of their magnitude or pernicious example, deserve the most public animadversion": 4 Bl. Com. *308. In the reign of Henry VII, the remedy by information, exhibited on leave of court by the master of the crown office, became the means of great oppression to the subjects of England, and so continued with little abatement until 4 and 5 William and Mary, c. 11, and c. 18, which provided, in effect, that the clerk of the crown, in the court of the King's Bench, should not, without express authority, to be given by the court when in session, exhibit, receive, or file any information for any of the causes for which it was allowable, nor issue any process thereon, without taking a recognizance from the person procuring such information to

be exhibited, but that the act should not extend to any other information than such as should be exhibited in the Court of King's Bench by the master of the crown office: 2 Hawk. P. C. 358.

This learned author, after quoting the acts, the substance of which is here given, makes the following declaration: "From whence it follows that informations exhibited by the attorney general remain as they were at the common law." In *King* v. *Joliffe,* 4 Durn. & E. 285, Lord Chief Justice KENYON, referring to the act regulating the exhibition of informations by the master of the crown office, says: "Before the statute 4 & 5 W. & M. c. 18, it was in the power of any individual to file an information, without disclosing to the court the grounds on which it was exhibited. But that practice being attended with the inconveniences recited in the preamble to that statute, it was enacted that no information should be filed without the express order of the court publicly given. That statute does not enumerate the grounds which are sufficient to enable us to grant the information, but the legislature left it to our discretion, trusting that we should not so far transgress our duty as to go beyond the rules of sound discretion. In ordinary cases affidavits are sworn in the court for the express purpose of praying an information upon them, but that does not preclude us from granting an information on affidavits equally authentic, although not made for that purpose." Sir James Fitzjames Stephen, in his History of the Criminal Law of England (volume 1, p. 296), in referring to the act of 1692, regulating informations exhibited by the master of the crown office, also observes: "The practical result of this statute has been to make a motion for a criminal information practically equivalent to a proceeding before magistrates in order to the committal of the accused." This distinguished jurist, on the page of his valuable work preceding that from which the foregoing excerpt is taken, in referring to the statute of 1494 (11 Hen. VII, c. 3), remarks: "This act was the one under which Empson and Dudley earned their obscure infamy." Blackstone, alluding to the act last referred to, and also to another ordained in the reign of the same sovereign, makes the following statement: "But when the statute, 3 Hen. VII, c. 1,

had extended the jurisdiction of the Court of Star Chamber, the members of which were the sole judges of the law, the fact, and the penalty, and when the statute, 11 Hen. VII, c. 3, had permitted informations to be brought by any informer upon any penal statute, not extending to life or member, at the assizes or before the justices of the peace, who were to hear and determine the same according to their own discretion, then it was that the legal and orderly jurisdiction of the Court of King's Bench fell into disuse and oblivion, and Empson and Dudley (the wicked instruments of King Henry VII), by hunting out obsolete penalties, and this tyrannical mode of prosecution, with other oppressive devices, continually harassed the subject and shamefully enriched the crown": 4 Bl. Com. *310.

It was the fear, undoubtedly entertained by the citizens of this country, that a violation of the rights of personal liberty, as practiced in England in the reign of King Henry VII, might possibly be repeated to their injury, that prompted congress to propose and secure the adoption of the Fourth Amendment to the Constitution of the United States. As this amendment was never intended to limit the powers of the states in respect to their own people, but was designed to operate on the national government only (*Spies* v. *Illinois*, 123 U. S. 131, 8 Sup. Ct. 21, 22, 31 L. Ed. 80; *Bolln* v. *Nebraska*, 176 U. S. 83, 20 Sup. Ct. 287, 44 L. Ed. 382), the framers of the constitution of this State embodied the substance thereof in the Bill of Rights, which declares: "No law shall violate the right of the people to be secure in their persons, houses, papers and effects, against unreasonable search or seizure; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized": Const. Or. Art. I, § 9. This restrictive clause has been incorporated into the statute of this State, which, so far as deemed involved herein, is as follows: An information is the allegation or statement made before a magistrate, and verified by the oath of the party making it, that a person has been guilty of some designated crime: B. & C. Comp. § 1581. When complaint is made to a magistrate of the commission of a crime, he must examine the informant on oath, and reduce his statement to

writing, and cause the same to be subscribed by him, and also take the depositions of any witnesses that the informant may produce in support thereof: B. & C. Comp. § 1584.. Thereupon, if the magistrate be satisfied that the crime complained of has been committed, and that there is probable cause to believe that the person charged has committed it, he must issue a warrant of arrest: B. & C. Comp. § 1585. The necessity of satisfying the magistrate that the crime complained of has been perpetrated, and that there is probable cause to believe that the person charged has committed it, as a condition precedent to the issuing of a warrant of arrest, is analogous to the leave of court which the master of the crown office in England was obliged to secure before he was permitted to exhibit an information in the name of his sovereign.

At common law the attorney general, ex officio, was invested with a discretionary power of filing informations charging the commission of misdemeanors, and hence he was not obliged to ask for or obtain leave of court before exercising the responsibility that devolved upon him by virtue of his office: 4 Bl. Com. *309. Thus, in *Rex* v. *Phillips,* 3 Burr. 1564, it was ruled that the attorney general had a right himself, ex officio, to exhibit an information without leave of court; Lord MANSFIELD saying: "This is not a case within the act of 4 W. & M. c. 18." To the same effect is *Rex* v. *Mayor of .Plymouth,* 4 Burr. 2089, in which case the same learned justice also remarked: "If it appears to the King's attorney general to be right to grant an information, he may do it himself. If he does not think it so, he cannot expect us to do it." The discretionary power vested in and exercised by the attorney general at common law devolves, in this country, in the absence of any statutory regulations, on the district attorneys (*State* v. *Douglas County Road Co.* 10 Or. 198; *State ex rel.* v. *Lord,* 28 Or. 498, 43 Pac. 471, 31 L. R. A. 473), who are entitled to prosecute persons for the commission of crimes by information, as a right pertaining to their office, and without leave of court: 1 Bishop, New Crim. Proced. § 144; *State* v. *Kyle,* 166 Mo. 287 (65 S. W. 763, 56 L. R. A. 115). "Therefore," says Mr. Justice THOMAS in *State* v. *Ransberger,* 106 Mo. 135 (17 S. W. 290), "when the prosecuting attorney files an

[17—46 Or.]

information, it is always official. It is his accusation, and for it he is responsible." In *Territory* v. *Cutinola,* 4 N. M. 160 (14 Pac. 809), it was held, notwithstanding the Fourth Amendment to the Constitution of the United States was in force in the Territory of New Mexico, that, under the rules of the common law as adopted in this country, it was not essential that an information filed ex officio by a prosecuting attorney, charging the commission of a misdemeanor, should be supported by affidavit. In that case the court criticises the decision of BILLINGS, J., in *United States* v. *Tureaud* (C. C.), 20 Fed. 621, cited by defendant's counsel, and states that the part of the opinion relied upon "is the mere dictum of the judge, and cannot be regarded as authority." Section 11 of Article II of the Constitution of Missouri, adopted October 30, 1875, declares that no warrant to seize any person shall issue without probable cause, supported by oath or affirmation reduced to writing. Section 12 of Article II of the organic law of that State, which originally provided for the prosecution of felonies by indictment only, was amended by resolution of the legislature, which, having been adopted by a vote of the people, took effect December 19, 1900, substituting the following in lieu of the former clause, to wit: "No person shall be prosecuted criminally for felony or misdemeanor otherwise than by indictment or information, which shall be concurrent remedies, but this shall not be construed to apply to cases arising in the land or naval forces or in the militia when in actual service in time of war or public danger": Laws Mo. 1899, p. 382. After this amendment was adopted, it was held, notwithstanding the constitution of that State required the oath or affirmation supporting the probable cause to be reduced to writing, that a prosecuting attorney might file a criminal information based on his official oath: *State* v. *Kyle,* 166 Mo. 287 (65 S. W. 763, 56 L. R. A. 115) ; *State* v. *Pohl,* 170 Mo. 422 (70 S. W. 695) ; *State* v. *Fletchall,* 31 Mo. App. 296; *State* v. *Wilkson,* 36 Mo. App. 373; *State* v. *Parker,* 39 Mo. App. 116.

The Bill of Rights of this State does not demand that the oath or affirmation sustaining the probable cause shall be reduced to writing, nor does our statute require an information charging the commission of a crime to be verified; and, in the absence of

any enactment on the subject, the rules of the common law in relation to informations exhibited by the attorney general are applicable and controlling. The district attorney of the proper judicial district in this State is responsible for all informations filed, and is not obliged to obtain leave of court to discharge his duty in this particular before he is permitted to exercise the discretion with which the law invests him. As the circuit court is authorized to convene a grand jury when deemed advisable (B. & C. Comp. § 1264), indictments and informations are therefore concurrent remedies, and, as the former means of charging the commission of a crime is based on and supported by the oath of the grand jurors, which fact, in this State, need not be recited in the written accusation, so an information, under our statute, need not be verified, for the official oath of the person whose duty it is to prosecute the formal charge complies with the requirement of the organic act, and supplies the necessary oath or affirmation, thereby supporting the probable cause.

3. It is contended by defendant's counsel that the District Attorney for the Fourth Judicial District did not prepare or file the information herein, and hence the court erred in denying their motion to set it aside. John Manning, the officer mentioned, having been called as a witness by defendant's counsel, testified that his signature to the information was not affixed by him, and that he was not in Portland the day the information was filed. L. C. Hartman and J. P. Fones, whose names are indorsed on the information, appearing as defendant's witnesses, severally testified that, in furnishing evidence as a basis for the information, they were sworn and examined in the office of the district attorney by a deputy. That part of the statute authorizing a prosecuting officer to nominate representatives is as follows: "A district attorney, during his continuance in office, shall be entitled to appoint as many deputies in each county as he may deem necessary, and may, by a written appointment filed with the clerk of the circuit court of the county, authorize such deputies, or any of them, to attend upon the sittings of the grand jury, and to attend to and transact all business pertaining to the district attorney's office": B. & C. Comp. § 2927, as amended by the act of December 28, 1903: Sp. Laws 1903, p. 32. No evi-

dence was offered at the trial tending to show that the appoint-ment of the deputy who signed the name of the district attorney to the information was in writing, or the extent of the power delegated to him.

At common law, though the attorney general was authorized to exhibit informations, without leave of court, charging the commission of misdemeanors, if that office was vacant the solicitor general was empowered to discharge that duty. In *Wilkes* v. *The King,* 6 Brown, Parl. Cases, 345, it was ruled that notice of the right of the solicitor general to exhibit an informa-tion would be taken, without proof of the vacancy in the office of attorney general. In that case it is said: "That the attorney and solicitor generals are invested by their offices with general authority to commence and prosecute the suits of the crown. It is true, the attorney general, as the superior officer, has the direction and control of his majesty's prosecutions, in which the solicitor general seldom interferes; but it is equally true that during the vacancy of the office of attorney general all the suits of the crown, both criminal and civil, are commenced, prose-cuted, and carried on by the solicitor general; that at the time when these informations were filed against Mr. Wilkes the office of attorney general was vacant, and consequently the solicitor general was the proper officer to exhibit them. But it is said that the fact of the vacancy ought to appear upon the record. The only pretense for such an averment is to inform the court of the vacancy, as an inducement to receive the information from the solicitor general, but there is no necessity for that intelli-gence. The attorney general is, in truth, an officer of, and has a place in, the Court of King's Bench, and the court will take notice of the vacancy of the office; and there are multitudes of instances of suits commenced and prosecuted by the solicitor general on behalf of the crown, without any averment or notice taken of the vacancy of the office of attorney general." In *Choen* v. *State,* 85 Ind. 209, it was held that an indictment, signed by a person as "special prosecuting attorney" was not subject to a motion to quash, or vulnerable to a plea in abate-ment which did not deny the due appointment of such special prosecuting officer. In deciding that case, Mr. Justice WOODS

says: "A court takes cognizance of its own officers and of the genuineness of their official signatures and designations."

4. In the case at bar the motion to set aside the information is based on the ground that it was not found, indorsed, or presented as required by law.  This objection was insufficient to challenge the appointment of the deputy district attorney, and, as the trial court is presumed to be cognizant of its own officers and of the measure of their powers, no proof of the appointment of the deputy was necessary.

5. There being no issue on this question, it must be assumed that the deputy district attorney possessed plenary power, and was authorized to examine witnesses to enable him intelligently to charge persons with the commission of crimes, to prepare informations, sign the name of the district attorney thereto, and to file them in the circuit court: *People* v. *Etting,* 99 Cal. 577 (34 Pac. 237) ; *United States* v. *Nagle,* Fed. Cas. No. 15,852. In *State* v. *Belding,* 43 Or. 95 (71 Pac. 330), it was held that the district attorney having filed an information containing his name, printed under the indorsement, "A true information," thereby adopted such printed name as his own signature, which bound him as effectually as if he had personally subscribed it to the accusation.  So, too, in the case at bar, when the district attorney insisted on the defendant's pleading to the information, he thereby ratified the subscription of his name by his deputy. The district attorney, by virtue of his election and oath of office, was authorized formally to charge persons with the commission of crimes perpetrated or consummated in the judicial district in which he was chosen, and, invoking the maxim, "Qui facit per alium facit per se," when he caused the defendant to go to trial on the information filed by his deputy he thereby verified under his official oath the facts constituting the gravamen of the charge. The office of deputy district attorney was not created by the organic law of this State, so as to require the appointee to swear to support the Constitution of the United States and of this State (Const. Or. Art. XV, § 3), nor have we been able to find any statutory provision demanding that he shall take an oath of office; but as the deputy, in the case at bar, did not subscribe his own name to the information, but signed that of the prosecuting

attorney, who is a constitutional officer (Const. Or. Art. VII, § 17), and specially required to take an oath of office (B. & C. Comp. § 2502), the information, which states the facts constituting the probable cause (*Jones* v. *Robbins,* 8 Gray, 329), is supported by an oath.

Believing that the defendant had a fair and impartial trial in the manner prescribed by law, and that no prejudicial error was committed, the judgment is affirmed.          ·          Affirmed.

Decided 27 March, 1905.

On Motion for Rehearing.

Mr. Justice Moore delivered the opinion.

6. It is contended by defendant's counsel, in their petition for a rehearing, that if it be conceded, as stated in the former opinion herein, that a district attorney in this State possesses the power, formerly exercised ex officio by the attorney general in England, of exhibiting informations for misdemeanors only, a district attorney in Oregon has no authority in that manner to charge a felony. The legal principle insisted upon challenges the power of the legislative assembly to confer upon the district attorney such authority. The only reason that can be assigned to support this point is that such a procedure is violative of the Fourteenth Amendment to the Constitution of the United States, in that it may result in the deprivation of life or liberty without due process of law. The Supreme Court of the United States, in construing this clause, has settled all controversy on the subject by holding that the prosecution of a person for a felony by an information only constitutes due process of law: *Hurtado* v. *California,* 110 U. S. 516 (4 Sup. Ct. 292, 28 L. Ed. 232) ; *Bolln* v. *Nebraska,* 176 U. S. 83 (20 Sup. Ct. 287, 44 L. Ed. 382).

7. The similarity of power exercised ex officio under the rules of the common law by the attorney general of England, and · that employed by a district attorney in this State, lies in the fact that the former was, and the latter, in the absence of legislation on the subject, is, authorized to perform the · duties devolving upon him without leave of court. A district attorney may therefore, in his own discretion, file an information charging the commission of any crime committed or triable in the county for

which he is elected or appointed. An examination of the rules of the common law, and an investigation of the mode of practice pursued by the attorney general of England thereunder, necessarily lead to the conclusion that a district attorney in this State, in the absence of any enactment on the subject, possesses the same measure of power exercised by him, and hence is not, like the master of the crown office, obliged to secure leave of court before he can exercise his discretion, but, like such attorney general, he has authority to file informations charging the commission of misdemeanors. This is the limit to the analogy between the powers of these officers, but, to the extent of the similarity indicated, the ancient law is germane and governs, demonstrating that a district attorney in this State possesses plenary power to file informations without permission of court.

His authority, however, so far as it relates to the filing of informations charging the commission of felonies, is not derived from the common law, but directly from the legislative assembly: B. & C. Comp. § 1258. The organic law of this State, in commanding the method to be pursued in securing jurors, is as follows: "The legislative assembly shall so provide that the most competent of the permanent citizens of the county shall be chosen for jurors; and out of the whole number in attendance at the court, seven shall be chosen by lot as grand jurors, five of whom must concur to find an indictment. But the legislative assembly may modify or abolish grand juries": Const. Or. Art. VII, § 18. The legislative assembly, exercising the power thus reserved, passed an act, which was approved February 17, 1899 (Laws 1899, p. 99), authorizing the district attorney of any judicial district in this State to file informations charging persons with the commission of any crimes defined and made punishable by the laws of Oregon that have been committed in the county where the information is filed: B. & C. Comp. § 1258. The information specified shall be substantially in the form prescribed for an indictment (B. & C. Comp. § 1304), except that the words "district attorney" shall be used instead of the words "grand jury" wherever the same occur: B. & C. Comp. § 1259. The information, when filed, shall be construed like, and deemed to be in all respects the same as, an indictment, and

the same proceedings shall be had, and with like effect, as in cases where indictments are returned by a grand jury: B. & C. Comp. § 1260. Any person within this State can be compelled by subpoena to appear before a district attorney to testify concerning any crime inquired of by him: B. & C. Comp. § 1261. The name of each witness thus examined by the district attorney shall be inserted at the foot of or indorsed upon the information before it is filed: B. & C. Comp. § 1262.

A perusal of the act in question, the substance of which is hereinbefore stated, will show that it is in effect a modification of the grand jury system, whereby that inquisitorial body has, except when in the opinion of the court deemed advisable (B. & C. Comp, § 1264), been superseded by the district attorney, who can find informations only on the testimony of witnesses taken before him, which tends to show that a crime has been committed in the county, and that there is reasonable cause to believe that the person to be charged is connected therewith and can upon a trial therefor be convicted thereof. The change in the manner of initiating criminal actions is a reasonable exercise by the legislative assembly of the power reserved by the people in the fundamental law, and because their representatives, when assembled, considered it appropriate to designate the district attorney as the proper person formally to charge the commission of crimes, his right to employ the authority conferred is as well founded as if the control in such matters had been delegated to any other person or number of persons.

8. "An information," as defined by the legislative assembly in 1864, "is the allegation or statement made before a magistrate, and verified by the oath of the party making it, that a person has been guilty of some designated crime": B. & C. Comp. § 1581. In modifying the grand jury system, the legislative assembly in 1899 designated the formal charge of the commission of a crime made by the district attorney as an "information," but the accusation in writing might have been indicated as well by any other name. The word "information," as defined in the statute first enacted, refers to the charge made before a magistrate, and in the last act to the complaint made by a district attorney. We do not think the legislative assembly, by desig-

nating the formal charge last referred to as an "information," thereby intended that the word used should be understood as meaning a verified statement, and for this reason resort must be had to Section 9 of the Bill of Rights of this State, and not to the statute defining the word, to determine whether or not the information filed by the district attorney should be verified by an oath indorsed thereon or specially made with reference thereto. The affidavits required to support the probable cause were originally sworn in the court for the express purpose of praying an information upon them: *King* v. *Jolliffe,* 4 Durn. & E. 285. As at common law the attorney general in England ex officio exhibited informations for misdemeanors without leave of court; no necessity existed for the making of an affidavit to support the probable cause, except by the master of the crown office. This was the rule of the common law as announced in *King* v. *Joliffe,* 4 Durn. & E. 285, when the Fourth Amendment to the Constitution of the United States was ratified, and also when Section 9 of the Bill of Rights of this State was adopted, commanding that no warrant should be issued but upon probable cause, supported by oath or affirmation. A reasonable interpretation of the clause of the organic law of this State, to which attention is called, when read in connection with the rules of the common law, leads to the conclusion that an indictment found and returned by a grand jury need not be specially verified by an oath of any person, and that the same rule also applies to informations exhibited without leave of court, which are in effect indictments found and returned by the district attorney. Where, however, leave of court is required as a condition precedent to the filing of an information, it would seem that the probable cause must be supported by an oath or affirmation before any warrant can be issued, unless the accused has had or waived a preliminary examination: *Ratcliff* v. *People,* 22 Colo. 75 (43 Pac. 553) ; *Holt* v. *People,* 23 Colo. 1 (45 Pac. 374) ; *Noble* v. *People,* 23 Colo. 9 (45 Pac. 376). As a district attorney in this State is not required to secure leave of court before he can file an information charging the commission of a crime, and as he has in effect been subrogated in lieu of the grand jurors in this respect, so that an information filed by him is tantamount to an

indictment returned by the grand jury, we think his oath of office, though promissory, is equivalent to the oaths of the grand jurors which are assertory, and each sufficiently supports the probable cause, though not indorsed thereon or specially connected therewith.

9. It is insisted by defendant's counsel that the bill of exceptions fails to disclose the person who subscribed the district attorney's name to the information. We think this question is unimportant, for the district attorney, having assisted in prosecuting the defendant, and being present when he was arraigned and secured an extension of time within which to plead, thereby adopted the signature appended to the written accusation, and ratified the act of the person who subscribed his name thereto: *State* v. *Belding*, 43 Or. 95 (71 Pac. 330).

The bill of exceptions shows that the district attorney was absent from Multnomah County June 15, 1904, the day the information was filed, at which time it also appears that a bench warrant for the arrest of the defendant was "ordered" to be issued on the motion of a deputy of the district attorney. Based on this condition of the transcript, it is contended by defendant's counsel that if ratification by the district attorney gave validity to the information, which they deny, such confirmation did not occur until after the bench warrant was executed, and hence it was issued without authority. The court's order that a bench warrant be issued is in effect a judgment awarding the relief demanded by the deputy district attorney when the information was filed. The issuance of the warrant in pursuance of such judgment is a ministerial act performed by the clerk of the court, usually upon the request of the officer entitled thereto. The bill of exceptions shows that on June 16, 1904, the district attorney was in the court when the defendant first appeared therein, but, no copy of the warrant being set out in the record, it does not affirmatively appear that the capias was not "issued" at the request of the district attorney himself before he took any part in the action in open court, thereby ratifying the finding of the information, and verifying it with his official oath, prior to the issuance of the bench warrant. The defendant had been arrested for the commission of the crime of which he was con-

victed, and was confined in jail therefor when the information was filed. His incarceration, therefore, rendered the immediate issuance of a bench warrant unnecessary, and the reasonable probabilities strengthen the conclusion reached, that the capias was not issued by the clerk until June 16, 1904, and then, possibly, upon the præcipe of the district attorney.

It follows from these considerations that the petition for a rehearing is denied.          AFFIRMED: REHEARING DENIED.