## WEEKS v. UNITED STATES.

### (Circuit Court of Appeals, Second Circuit.   June 18, 1914.)

### No. 180.

1. INDICTMENT AND INFORMATION (§ 52*)—REQUISITES OF INFORMATION—VERIFICATION OR ACCOMPANYING AFFIDAVIT.

In the United States the informations used by the prosecuting officers are the informations used by the Attorney General in England, and not those exhibited by masters of the crown, and which were governed by 4 and 5 William and Mary, c. 18; and as at common law an information could be filed by the Attorney General simply on his oath of office, and without verification, the verification of an information by a prosecuting attorney in this country is unnecessary, unless required by some constitutional or statutory provision.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. §§ 163–168; Dec. Dig. § 52.*]

2. INDICTMENT AND INFORMATION (§ 52*)—INFORMATION IN FEDERAL COURTS—NECESSITY FOR VERIFICATION OR AFFIDAVIT OF PROBABLE CAUSE.

The provision of the fourth constitutional amendment that "no warrants shall issue but upon probable cause supported by oath or affirmation," which is a limitation upon the powers of the federal government only, does not require an information filed by a district attorney of the United States to be verified or supported by an affidavit based on personal knowledge and showing probable cause, unless such information is made the basis of an application for a warrant of arrest. If the sole purpose of the information is to state the accusation, a defendant may be charged and tried for a misdemeanor on an information not verified nor so supported.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. §§ 163–168; Dec. Dig. § 52.*]

In Error to the District Court of the United States for the Southern District of New York.

Criminal prosecution by the United States against Oscar J. Weeks, doing business under the name of O. J. Weeks & Co.   Judgment of conviction, and defendant brings error.   Affirmed.

Walter Jeffreys Carlin, of New York City, for plaintiff in error.

H. Snowden Marshall, U. S. Atty., of New York City (Robert Stephenson, of New York City, of counsel), for the United States.

Before COXE, WARD, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge.   The defendant has been convicted of a crime committed in violation of the Pure Food and Drugs Act, approved June 30, 1906 (Act June 30, 1906, c. 3915, 34 Stat. 768 [U. S. Comp. St. Supp. 1911, p. 1354]).   The information charged the

defendant with having shipped from New York City to St. Louis, Mo., a certain article of food, labeled in part as follows:

"Cream thick—Serial No. 2049—Manufactured by O. J. Weeks & Co., New York, New York. It is guaranteed to contain no gelatine, gum arabic, egg albumen or similar article."

This label, it was charged, was false and misleading and calculated to mislead and deceive purchasers in that the article of food contained as one of its ingredients an article similar to gum arabic, to wit, India gum. The information was signed by the United States Attorney, but was not verified, nor were any affidavits filed or submitted to the court. The defendant appeared and demurred to the information, and in specification of points under his demurrer alleged:

"That the said information is not supported by a verification or oath showing personal knowledge or probable cause."

His demurrer was overruled, and, being required to plead, he pleaded not guilty. At the close of the trial his counsel renewed his motion that the information be dismissed for reasons before stated, but his motion was denied, and the case was submitted to the jury, and a verdict of guilty was rendered.

The question we have to decide, therefore, is whether an attorney for the United States can proceed in the courts of the United States by information to prosecute one who is alleged to have committed a misdemeanor, where the information is not verified or supported by an affidavit showing personal knowledge or probable cause.

There can be no conviction or punishment for a crime without a formal and sufficient accusation. A court can acquire no jurisdiction to try a person for a criminal offense unless he has been charged with the commission of the particular offense and charged in the particular form and mode required by law. If that is wanting, his trial and conviction is a nullity, for no person can be deprived of either life, liberty, or property without due process of law. The forms or modes of accusation which the law recognizes are: Indictment or presentment by a grand jury; and information by the public prosecutor.

The colonists who came to this country from England brought with them the common and statute laws of England as they existed at the time of their emigration and in so far as they were applicable to the local circumstances of the colonies which they established. Among the principles of the common law which they thus brought were those which regulated the mode of proceeding in criminal cases: The law relating to indictments and informations and the right to trial by jury. Prior to the Declaration of Independence, various statutes had abolished in the colonies as well as in England a number of the oppressive provisions of English law relating to criminal trials. Among the principles which had thus been abrogated, for example, was that which denied to a person accused of a capital crime the right to have compulsory process for his witnesses, and that which withheld from him the right to examine on oath those witnesses who voluntarily appeared for him, as well as that which forbade him the aid of counsel in

his defense, except only as regarded the questions of law.   See United States v. Reid, 12 How. 361, 363, 13 L. Ed. 1023 (1851).

The proceeding by information is said to have been unpopular in England and to some extent in the colonies.  But it has never been abolished in England, although in some of our states it has been done.  At the time of the Declaration of Independence it was a familiar mode of criminal procedure in all the colonies.

When the statute of 3 Henry VII extended the jurisdiction of the court of star chamber and informations became restricted in practice to that court, the members of which were the sole judges of the law, the fact, and the penalty, a very oppressive use was made of them for something more than a century, "so as continually to harass the subject and shamefully enrich the crown."   4 Blackstone, Comm. p. 310.   And when the court of star chamber was abolished in the time of Charles I, and proceedings by information were again used in the Court of King's Bench, the prejudice which had arisen from the long abuse of informations was so strong that it was strenuously contended that all proceedings by information were illegal as being contrary to the nature of English laws and to Magna Charta.   But the objections were overruled; Sir Matthew Hale saying:

"That although in all criminal cases the most regular and safe way, and most consonant to the statute of Magna Charta, is by presentation or indictment of 12 sworn men, yet, for crimes inferior to capital ones, proceedings might be by information, and this, from long and frequent practice, was certainly established as the law of the land."  5 Mod. 463; Show. 106; Bacon's Ab., Information, A; 2 Hawk. P. C. 260; 4 Black. Com. 310; 1 Ersk. Speeches, 275; State v. Dover, 9 N. H. 468 (1838).

And the unpopularity of informations was not restricted to the mother country but, as we have already said, existed to some extent in this country.   Mr. Justice Wilson of the Supreme Court of the United States, and who was also a member of the Constitutional Convention of 1787, in the lectures which he delivered as professor of law in the University of Pennsylvania in 1790–92, after calling attention to the two kinds of informations—those filed ex officio by the public prosecutor and those carried on in the name of the commonwealth or crown but in fact at the instance of some private person or common informer—said:

"The first have been the source of much; the second have been the source of intolerable vexation; both were the ready tools, by using which Empson and Dudley and an arbitrary star chamber fashioned the proceedings of the law into a thousand tyrannical forms.   Neither, indeed, extended to capital crimes; but ingenious tyranny can torture in a thousand shapes without depriving the person tortured of his life."

After calling attention to the fact that in England restraints had been imposed upon informations at the instance of private persons but not upon those filed ex officio by the public prosecutor, he went on to say:

"By the Constitution of Pennsylvania, both kinds are effectually removed. By that Constitution, however, informations are still suffered to live; but they are bound and gagged.   They are confined to official misdemeanors; and even against those they cannot be slipt but by leave of the court.   By that

Constitution, 'no person shall, for any indictable offense, be proceeded against criminally by information,' 'unless by leave of the court, for oppression and misdemeanor in office.'" 2 Wilson's Works (Andrews' Ed.) p. 450.

There seems to be no doubt that prosecution by information is as ancient as the common law itself. The subject had no reason to complain because this method of prosecution was adopted, for, as Blackstone (4 Commentaries, p. 310) states:

"The same notice was given, the same process was issued, the same pleas were allowed, the same trial by jury was had, the same judgment was given by the same judges, as if the prosecution had been by indictment."

Moreover, it seems to have always been the rule that the substantial parts of the information had to be drawn with as much exactitude as the corresponding parts of an indictment for the same offense.

In the early years of the federal government, informations were principally used, if not exclusively used, for the recovery of fines and forfeitures. And Mr. Justice Story in his Commentaries on the Constitution, § 1780, published in 1833, said, in speaking of informations:

"This process is rarely recurred to in America; and it has never yet been formally put into operation by any positive authority of Congress under the national government, in mere cases of misdemeanors, though common enough in civil prosecutions for penalties and forfeitures."

But within the last 50 years prosecutions by informations have increased greatly in the federal courts. See Ex parte Wilson, 114 U. S. 417, 425, 5 Sup. Ct. 935, 29 L. Ed. 89.

It appears, as Stephens states in his History of the Criminal Law, vol. 1, p. 295, that from the earliest times the law officers of the king accused persons of offenses not capital in his own court without the intervention of a grand jury. But the right to prefer a criminal information is at common law restricted to misdemeanors.

"At common law any information will lie for any misdemeanor, but not for a felony." 22 Cyc. 187, and cases there cited.

The offense charged in the information now under consideration was plainly a misdemeanor, and for more than 200 years in England the right has been established to prosecute by information, and, without the sanction of a grand jury, a person charged with having committed a misdemeanor.

[1] Bacon in his Abridgment, vol. 3, 635, after stating that an information differs principally from an indictment in that "an indictment is an accusation found by the oath of 12 men, whereas an information is only the allegation of the officer who exhibits it," goes on to explain that there were two kinds of criminal informations in use in England under the common-law procedure. The first, which was for offenses more immediately against the king, was filed, he says, by the Attorney General ex officio and without leave of court. The second, which was for offenses against private individuals, was exhibited by masters of the crown, and, as matter of course, prior to the statute of 4 and 5 William and Mary, c. 18. But, after that statute was enacted, informations of the second class, he declares, could not be filed except upon leave of court, and all such informa-

tions had to be supported by the affidavit of the person at whose suit it was filed.

In the United States it has been suggested that informations brought by the prosecuting officers answer to the informations filed by the masters of the crown, and which, as said, had to be supported by affidavit and not to the informations of the first class or those which related more immediately to the king and which could be filed without affidavit. Those who make this suggestion rely upon the statement found in Blackstone's Commentaries, vol. 4, p. 309, where that distinguished commentator says:

"The objects of the king's own prosecutions, filed ex officio by his own Attorney General, are properly such enormous misdemeanors as peculiarly tend to disturb or endanger his government, or to molest or affront him in the regular discharge of his royal functions. For offenses so high and dangerous, in the punishment or prevention of which a moment's delay would be fatal, the law has given to the crown the power of an immediate prosecution, without waiting for any previous application to any other tribunal, which power, thus necessary, not only to the ease and safety, but even to the very existence of the executive magistrate, was originally reserved in the great plan of the English Constitution, wherein provision is wisely made for the due preservation of all its parts. The objects of the other species of informations filed by the master of the crown office upon the complaint or relation of a private subject are any gross and notorious misdemeanors, riots, batteries, libels, and other immoralities of an atrocious kind, not peculiarly tending to disturb the government (for those are left to the care of the Attorney General), but which, on account of their magnitude or pernicious example, deserve the most public animadversion."

Now this statement may seem to imply that the Attorney General's right to file informations for misdemeanors was not unlimited but was restricted to misdemeanors which tended to disturb or endanger the government. But, if this was his meaning, it is evident that he was mistaken in his understanding of the law.

Chitty in his great work on the Criminal Law, p. 884, says:

"Informations may be filed by the Attorney General for any offense below the dignity of felony, which tends, in his opinion, to disturb the government or immediately interfere with the interests of the public or the safety of the crown. He most frequently exercises this power in cases of libels on governments or high officers of the crown, etc. He seems, indeed, at his option to exact it when any offense occurs which may thus be prosecuted in the crown office. He may file an information against any one whom he thinks proper to select, without oath, without motion or opportunity for the defendant to show cause against the proceeding."

And Cole in his work on Criminal Informations, p. 9, says that:

"The Attorney General may exhibit an ex officio information for any misdemeanor whatever."

And Hawkins in his Pleas of the Crown, vol. 2, p. 369, says:

"As to the first of these particulars, viz., in what cases such informations lie, it hath been holden that the king shall put no one to answer for a wrong done principally to another, without an indictment or presentment, but that he may do it for a wrong done principally to himself. But I do not find this distinction confirmed by experience, for it is everyday's practice, agreeable to numberless precedents, to proceed by way of information, either in the name of the Attorney General or of the master of the crown office, for offenses of the former kind, as for batteries, cheats, seducing a young man

or woman from their parents in order to marry them against their consent, or for any other wicked purpose, spiriting away a child to the plantations, rescuing persons from legal arrests, perjuries, and subornations thereof, forgeries, conspiracies, whether to accuse an innocent person or to impoverish a certain set of lawful traders, * * * and other such like crimes done principally to a private person, as well as for offenses done principally to the king."

In Clark on Criminal Procedure, pp. 128, 129, it is said:

"By an early English statute (4 and 5 William and Mary, c. 18), however, which is old enough to have become a part of our common law, if applicable to our conditions, it was provided that informations by masters of the crown office could only be filed by leave of court, and that they should be supported by the affidavit of the person at whose suit they were preferred. The law remained that informations filed by the Attorney General (and as already stated he could file them for any misdemeanor) need not be verified, and that he was the sole judge of the necessity or propriety of filing them. * * * There is some authority for the proposition that the kind of information to be used at common law in this country is that which in England was filed by the masters of the crown office. * * * But, by the better opinion, the other kind of information is the one in use with us."

In Bishop's Criminal Procedure, § 144, it is said:

"In our states the criminal information should be deemed to be such, and such only, as in England is presented by the attorney or solicitor general. This part of the English common law has plainly become common law with us. As with us the powers which in England were exercised by the attorney or solicitor general are largely distributed among our district attorneys, whose office does not exist in England, the latter officers would seem to be entitled, under our common law, to prosecute by information, as a right adhering to their office and without leave of court."

If it is true, and it seems to be, that the district attorneys exercise the powers which in England were exercised by the attorney or solicitor general, then they are entitled to proceed upon information, and that without leave of the court and without affidavit.

It is necessary to keep in mind what Mr. Stephens in his General View of the Criminal Law of England, p. 156, calls the "most characteristic principle of the law of England" on the subject of criminal procedure, namely, that in that country "everyone, without exception, has the right to use the queen's (king's) name for the purpose of prosecuting any person for any crime." The statute (4 and 5 W. & M. c. 18) was intended to restrict the right of prosecution by private, and not public, prosecutors. Prior to that act it had been within the power of any individual to file an information without disclosing to the court the grounds upon which it was exhibited. 4 T. R. 290. And the meaning of the statute was that the clerk of the crown should thereafter file no information of a private prosecutor without leave of the court, and that the fact that there was probable cause for filing it should be disclosed in order that the court might know whether to grant leave, and it was further intended to preclude the issuance of process on such informations without recognizance. Comyn's Digest, vol. 4, p. 558, note "d." But there was no intention to limit the right of the Attorney General to prosecute by information, as he always had done. It was not necessary in England, either before or after the statute, that he should obtain leave of the court before fil-

ing his information, and there was therefore not the same reason why he should verify any information which he filed. Moreover, he was acting throughout under his oath of office, and it was not assumed that he would proceed upon information without probable cause.

We think that the weight of authority is that in this country, as the text-writers assert, the information used by the prosecuting officers are the informations used by the Attorney General in England and not those exhibited by masters of the crown and which were governed by 4 and 5 William and Mary, c. 18. And as at common law an information could be filed by the Attorney General simply on his oath of office and without verification, it has been held in this country that verification of an information by a prosecuting attorney is unnecessary, unless required by some constitutional or statutory provision. Long v. People, 135 Ill. 435, 25 N. E. 851, 10 L. R. A. 48; People v. Graney, 91 Mich. 646, 52 N. W. 66; State v. Pohl, 170 Mo. 422, 70 S. W. 695; 22 Cyc. 281.

We pass, therefore, to inquire whether there is anything in the Constitution of the United States or in the acts of Congress which in any way alters the common law respecting the right of the prosecuting officers of the government of the United States to proceed by information in criminal cases in the federal courts.

The Constitution of the United States leaves all offenses against the United States open to prosecution by information except those which are capital or infamous. The restriction as to those offense is contained in the fifth amendment:

"No person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger."

The Supreme Court in Ex parte Wilson, 114 U. S. 417, 5 Sup. Ct. 935, 29 L. Ed. 89 (1885), authoritatively decided what meaning is to be attached to the word "infamous" in this connection. The court held that a crime punishable by imprisonment for a term of years with hard labor is an infamous crime. In the constitutional sense it is not the character of the crime but the nature of the punishment which renders the crime infamous. The offense with which the defendant in this case is charged is not an infamous one but one upon which he might be tried upon information.

The Acts of Congress not only have not prohibited the use of informations but have on the contrary expressly authorized their use in certain cases. See section 1022 of the Revised Statutes (U. S. Comp. St. 1901, p. 720).

The fourth amendment to the Constitution of the United States provides as follows:

"The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; no warrants shall issue but upon probable cause supported by oath or affirmation and particularly describing the place to be searched and the persons or things to be seized."

Mr. Justice Story in his Commentaries on the Constitution, vol. 2, § 1902, in speaking of this amendment, states that:

"It is little more than the affirmance of a great constitutional doctrine of the common law."

If that be true, and if it also be true that at common law the Attorney General could file an information without verification or affidavit of probable cause, his oath of office being regarded as sufficient, then this particular amendment should not be regarded as altering the rule upon that subject.

In United States v. Maxwell, 3 Dill. 275, Fed. Cas. No. 15,750 (1875), in an opinion written by Judge Dillon, it is said:

"We are of the opinion, therefore, that offenses not capital or infamous may in the discretion of the court be prosecuted by information. We cannot recognize the right of the District Attorney to proceed on his own motion, and shall require probable cause of guilt to appear by the oath of some credible person before we will allow an information to be filed and a warrant of arrest to issue. But with these safeguards there is no more reason to fear an oppressive use of information than there is reason to fear an abuse of the powers of a grand jury."

The facts in that case were that prior to the term complaint on oath had been made before a United States commissioner charging the defendant with several violations of the internal revenue laws, and the defendant was arrested upon a warrant issued by the commissioner and held to answer to the District Court. At the term the District Attorney upon the said complaint, warrant, and recognizance moved the court for leave to file criminal information against the defendant charging him with the said offenses, which leave was granted and the information accordingly filed. The defendant appeared and pleaded guilty. Afterwards his counsel made a motion in arrest of judgment upon the ground that the defendant could only be punished criminally upon an indictment and not upon an information. The motion in arrest of judgment was overruled; the court using, in the course of its opinion, the language already quoted. The case cannot be regarded as holding that an information must be verified. The court in a dictum announced that it would not permit an information to be filed and a warrant of arrest to issue without some evidence being presented under oath that probable cause of guilt existed.

In United States v. Smith (C. C.) 40 Fed. 755 (1889), in a case which arose in the Circuit Court for the Eastern District of Virginia, Judge Hughes said:

"A preliminary question raised in the argument was whether the District Attorney may of right, by virtue of his official prerogative, file informations charging citizens with offenses brought officially to his knowledge. This cannot be done, under the rules and practice of this court, except upon previous complaint under oath, after opportunity has been given the accused to appear before the examining officer, and to confront the witnesses testifying in support of the complaint. This requisite makes it necessary that the District Attorney shall have leave from the court to file an information; and, if it is within the discretion of the court whether to grant the leave or not, then the right to file is not a prerogative of the prosecutor's office, and the court may require him, before granting leave, to bring the accused, by rule or other proceeding, before the court, to show cause, if cause there be, against the filing of the information."

The case most frequently cited in the federal courts on this subject is that of United States v. Tureaud (C. C.) 20 Fed. 621, decided in 1884 in the Fifth Circuit by Judge Billings of the Eastern District of Louisiana. It was decided in that case that informations must be based upon affidavits which show probable cause arising from facts within the knowledge of the parties making them. And the court quashed an information which was based on an affidavit which read:

"George A. Dice, being duly sworn, says: All the statements and averments in the foregoing information are true, as he verily believes."

It was conceded:

"That, under the usages of the government of Great Britain this information belongs to the class of formal accusations which could be made by the king in his courts without any evidence and against all evidence."

The opinion then continued:

"But the adoption of the fourth amendment affected all kinds and modes of prosecution for crimes or offenses, for there can be no legal pursuit of accused persons without apprehension. All prosecutions require warrants. An information, a suggestion of a criminal charge to a court, is a vain thing, unless it is followed by a capias. The procedure by information, therefore, after it was acted upon by this amendment, lost its prerogative function or quality. It could not thereafter be the vehicle of preferring any arbitrary accusation—not by kings because we have in the department of criminal law no successor to him, so far as he represented a right to institute, if it pleased him, unsupported incriminations. Nor by the District Attorney, nor any other officer of the United States, for the Constitution has said in effect that in no way nor manner shall magistrates or courts issue warrants, except upon proofs, which are to be upon oath and make probable excuse."

What is said as to the necessity for a verification of the information we think is correct in any case where the application for the issuance of a warrant of arrest is based on the information. In United States v. Polite, 35 Fed. 58 (1888), in the District Court for the District of South Carolina, it is said that:

"Informations must be based upon affidavits which show probable cause arising from facts within the knowledge of the parties making them, and mere belief is not sufficient."

In this case the information was not sworn to, but accompanying it were the papers of the commissioner who held the preliminary examination, including the sworn testimony of the witnesses taken in the presence of the accused. It was held that this was sufficient, and a motion to quash was refused.

In Johnston v. United States, 87 Fed. 187, 30 C. C. A. 612 (1898), in the Circuit Court of Appeals for the Fifth Circuit, the two preceding cases are referred to and approved. The information was not sworn to but was accompanied by an affidavit. The court said:

"The affidavit on which the information was based was wholly insufficient to warrant the arrest and trial of the plaintiff in error, and is altogether too general in terms as to the offense against the United States said to have been committed; and it shows no knowledge, information, nor even belief on the part of the affiant as to the guilt of the party charged, beyond the bare statement that 'there is probable cause to believe that the said offense has been committed by P. T. Johnston.' However false the affidavit may be, it would be next to impossible to assign and prove perjury upon it."

In United States v. Baumert (D. C.) 179 Fed. 735, 742 (1910), District Judge Ray, in a carefully prepared opinion said:

"Under the common law the information was not necessarily verified; but, as stated, this led to abuses and the adoption of the fourth amendment to the Constitution, which in legal effect demands that no warrant shall issue upon an information filed by the United States attorney, unless it state facts, a crime, etc., and is supported by the oath of the officer filing it, who must speak from personal knowledge, or by the oaths or affirmations of others who speak from personal knowledge."

There is nothing in the opinion rendered which holds that an information must in all cases be verified or supported by an affidavit showing probable cause. But only that an information must be so verified or supported when an application for the issuance of a warrant is based on it. The sole question before the court was as to the issuance of a warrant, and the court declined to direct its issuance on an information made on the information and belief of the District Attorney alone.

In United States v. Morgan, 222 U. S. 274, 282, 32 Sup. Ct. 81, 82 (56 L. Ed. 198 [1911]), the Supreme Court, in the case of one prosecuted for a violation of the Pure Food and Drugs Act, said:

"A further answer is that as to this and every other offense the fourth amendment furnishes the citizen the nearest practicable safeguard against malicious accusations. He cannot be tried on an information unless it is supported by the oath of some one having knowledge of facts showing the existence of probable cause. Nor can an indictment be found until after an examination of witnesses, under oath, by grand jurors—the chosen instruments of the law to protect the citizen against unfounded prosecutions, whether they be instituted by the government or prompted by private malice."

This statement as to the necessity of the information being supported by the oath of some one having knowledge of facts showing the existence of probable cause is obiter dictum. That court has certainly never decided that, under such circumstances as exist in the case now before us, no trial could be had.

In Foster's Federal Practice (5th Ed.) § 494, p. 1659, this usually accurate writer states the rule as follows:

"An information cannot be filed without leave of the court. * * * An information must be supported by an affidavit showing probable cause for the prosecution arising from facts within the knowledge of the affiant, or by the depositions of witnesses taken upon a preliminary examination or affidavits upon which a warrant of arrest against the accused was previously issued, which may be sufficient."

The limitation imposed by this amendment is a limitation solely upon the powers of the federal government and not upon the powers of the state governments. This principle of construction was settled as early as 1833 by a decision written by Chief Justice Marshall in the leading case of Barron v. Baltimore, 7 Pet. 243, 8 L. Ed. 672, and has been adhered to by the Supreme Court in numerous cases which subsequently have arisen. But in the constitutions of some of the states a provision exists similar to that embodied in the fourth amendment. And we may briefly inquire as to the effect given to it, as respects informations, by the decisions of the state courts. They

have held in a number of cases that a constitutional provision similar in terms to that embodied in the fourth amendment to the Constitution of the United States is violated if proceedings are had under an information which is not supported by the oath or affirmation of any person (Lustig v. People, 18 Colo. 217, 32 Pac. 275 [1893]; State v. Gleason, 32 Kan. 245, 4 Pac. 363 [1884]; Myers v. People, 67 Ill. 503 [1873]; Eichenlaub v. State, 36 Ohio St. 140 [1880]; De Graff v. State, 2 Okl. Cr. 519, 103 Pac. 538 [1909]; Thornberry v. State, 3 Tex. App. 36 [1877]; State v. Boulter, 5 Wyo. 236, 39 Pac. 883 [1894]); but the state courts are not agreed in this view, some of them having reached a contrary conclusion. See State v. Smith, 114 La. 322, 38 South. 204 (1905); State v. Guglielmo, 46 Or. 250, 79 Pac. 577, 80 Pac. 103, 69 L. R. A. 466, 7 Ann. Cas. 976 (1905); Territory v. Cutinola, 4 N. M. (Gild.) 160, 14 Pac. 809 (1887).

[2] In the case at bar the information was not verified; neither was it supported by any affidavit. The information begins:

"Now comes Henry A. Wise, United States Attorney for the Southern District of New York, leave having been first had and obtained, and respectfully informs this court that," etc.

It does not appear, however, that, in obtaining leave of the court to file the information, there was ever presented to the court any complaint under oath or any affidavit showing probable cause to believe that the person accused in the information had ever committed the offense charged against him. If the fourth amendment makes it necessary that, under all circumstances, an information must be verified or supported by an affidavit showing probable cause, then proceedings had in the prosecution of the defendant cannot be sustained. But the right secured to the individual by the fourth amendment, as we understand it, is not a right to have the information, by which he is accused of crime, verified by the oath of the prosecuting officer of the government or to have it supported by the affidavit of some third person. His right is to be protected against the issuance of a warrant for his arrest, except "upon probable cause supported by oath or affirmation," and naming the person against whom it is to issue. If the application for the warrant is made to the court upon the strength of the information, then the information should be verified or supported by an affidavit showing probable cause to believe that the party against whom it is issued has committed the crime with which he is charged. But, if no warrant has issued, no arrest been made, and the person has voluntarily appeared, pleaded to the information, been tried, convicted, and fined, we fail to discover wherein any right secured to him by the fourth amendment has been infringed. The fact that in the case at bar the defendant demurred to the information because it was not verified, and then pleaded not guilty only after his objection to the demurrer was overruled, does not affect the matter. There was nothing in the ruling of the court that deprived him of his constitutional right to have no warrant issued for his arrest "but upon probable cause supported by oath or affirmation." No such warrant has been at any time issued, and no application for its issuance has ever been so much as requested.

The Pure Food and Drugs Act makes it a crime against the United States if any part of the label on goods sent in interstate commerce is false and misleading. The label used on the goods shipped by the defendant guaranteed that the goods contained "no gelatine, gum arabic, egg albumen or similar article." The claim of the government is that, while the goods contained no gum arabic, they did contain India gum, and that India gum was "similar" to gum arabic. The jury found that this was so after being instructed that, if they had a reasonable doubt on the subject, they must find for the defendant. There was sufficient evidence to warrant the submission of the case to the jury, and we find no error in the rulings of the court.

Judgment affirmed.