## In re GEORGE W. McNAUGHT.

No. A48. Opinion Filed January 11, 1909.

(99 Pac. 241.)

1. CONSTITUTIONAL LAW—"Due Process of Law"—Indictment by Grand Jury. The words "due process of law" in the fifth and fourteenth amendments to the Constitution of the United States, and in section 7 of the Bill of Rights of the Constitution of Oklahoma (Bunn's Ed. sec. 16), do not necessarily require an indictment by a grand jury in a prosecution by the state for the crime of murder committed after statehood.

2. INDICTMENT AND INFORMATION—"Information"—Officer Authorized to File. In England, at common law, an "information" was an accusation of a criminal character exhibited against a person charging him or her with a criminal offense by the Attorney General or the Solicitor General and under his oath of office. In the United States, in the absence of statutes changing its character, it is filed by the

officer, whatever his title, who exercises the function of prosecuting attorney for the county.

3.   SAME—Concurrent Remedies in Felonies.   The Constitution of Oklahoma (Const. art. 2, sec. 17 [Bunn's Ed. sec. 26]) authorizes prosecutions for felonies by information after examination and commitment by a magistrate without indictment by a grand jury.   The criminal procedure act, being chapter 18, Gen. St. 1908, makes provisions for a preliminary examination before a committing magistrate in the presence of the accused, who is entitled to the aid of counsel and the right of examination of witnesses, whose testimony may be reduced to writing at his request; and upon a finding by the magistrate that a felony has been committed, and that there is sufficient cause to believe the accused guilty thereof, an order, holding him to answer thereto before the district court of the county in which the offense is triable, shall be made, and the prosecution in that county may be by indictment or information, as they are concurrent remedies.

4.   CONSTITUTIONAL LAW—Prosecution by Information—Self-Executing Provisions.   The provision of the Constitution that provides for and authorizes the prosecution of felonies by information after the accused has had a preliminary examination before an examining magistrate, or having waived such preliminary examination (being section 17 of the Bill of Rights [Bunn's Ed. sec. 26]), is self-executing from the time of the organization of this state.

5.   INDICTMENT AND INFORMATION.   A conviction after examination and commitment upon a written complaint charging the crime of murder, committed after statehood, upon information duly verified and filed in the district court for murder, and a trial, and conviction of manslaughter in the first degree, and sentence for life imprisonment thereon, are not illegal and void.

6.   HABEAS CORPUS—Judgment Valid on Face.   Section 2411, Gen. St. 1908, provides:   "No court or judge shall inquire into the legality of any judgment or process, whereby the party is in custody, or discharge him when the term of commitment has not expired in either of the cases following:   *   *   *   (2)   Upon any process issued on and final judgment of a court of competent jurisdiction;   *   *   *   (4)   Upon a warrant or commitment issued from the district court, or any other court of competent jurisdiction, upon an indictment or information."   And a judgment by a court of competent jurisdiction, valid on its face, is an unanswerable return to a writ of habeas corpus issued for the relief of a prisoner imprisoned by virtue of such judgment.

7.   SAME—Grounds for Relief—Irregularities in Selection of Jury.   Irregularities in the selection and impaneling of the trial jury do not affect the jurisdiction of the court so as to justify release by habeas corpus of a person so convicted.

8.   SAME—Scope of Review.   The review of a judgment of conviction and imprisonment by writ of habeas corpus is limited to the questions: Had the court which rendered the judgment jurisdiction of the subject-

matter and of the person convicted? And did the court in the course of the proceedings which resulted in the judgment exceed its jurisdiction?

9.     SAME—Grounds for Relief—Sentence Excessive. If the vice of the sentence relied on is that it is oppressive and excessive in character, and not that it is of an entirely different character from that authorized by law, to the extent that it is void, the prisoner will be remanded.

10.    SAME—Remedy by Appeal. The Criminal Code of Oklahoma provides that: "Whenever any person is declared punishable for a crime by imprisonment in the state prison for a term not less than any specified number of years, and no limit to the duration of such imprisonment is declared, the court authorized to pronounce judgment upon such conviction, may in its discretion sentence such offender to imprisonment during his natural life, or for any number of years not less than such as are prescribed." And the Criminal Court of Appeals will not on habeas corpus review the question of excessive punishment. (Syllabus by the Court.)

Original application by George W. McNaught for a writ of *habeas corpus.* Writ denied, and petitioner remanded.

The petitioner, George W. McNaught, was convicted in the district court of Kingfisher county of manslaughter in the first degree, and he was sentenced to life imprisonment in the state penitentiary under an information filed by the county attorney of said county. On December 7, 1908, he filed in this court a petition signed and verified by his oath, and which, omitting the formal parts, was as follows:

"Comes now George W. McNaught of Kingfisher, Oklahoma, and alleges: That on the 28th day of September, 1908, the same being a regular judicial day of the September, 1908, term of the district court sitting in and for the county of Kingfisher, state of Oklahoma, M. W. Hinch, the county attorney of Kingfisher county, in said state, filed in said district court a certain information, a copy of which is hereto attached and marked 'Exhibit A' and made a part hereof, the same as if written herein in full, charging your petitioner with the crime of murder, That thereafter, to wit, on the 29th day of September, 1908, your petitioner duly appeared in open court and entered his plea of not guilty to said information. That thereafter, and during the said term of said district court, your petitioner was placed upon trial and tried in open court upon said information

and plea thereto before said district court and a jury, and there-after and during said term of court, to wit, on the 20th day of October, 1908, said jury returned into open court with its verdict in said cause finding your petitioner guilty of man-slaughter in the first degree, a copy of which verdict is hereto annexed marked 'Exhibit B' and is made a part hereof, the same as if written in full; and said verdict was received and filed in open court, and the jury was thereupon discharged, all without the consent of and over the protest and objection of your petition-er. That thereafter, and during said term of court, to wit, on the 23d day of October, 1908, said district court, in open court and in the presence of your petitioner, rendered judgment and sen-tence on said verdict against your petitioner, and adjudged your petitioner guilty of manslaughter in the first degree, as charged in the second count of said information and as found by the verdict of said jury; and that your petitioner, for said offense, be punished by being imprisoned in the state penitentiary for and during the term of his natural life. And said court further ordered that the sheriff of Kingfisher county, Oklahoma, im-mediately transport your petitioner to said penitentiary and de-liver him to the warden or keeper thereof, and by said warden or keeper receive and confine him in said penitentiary according to the judgment and sentence of the court. A true, full, and complete copy of said judgment and sentence is hereto annexed, marked 'Exhibit C' and made a part hereof as if written herein in full. That thereafter, to wit, on the 24th day of October, 1908, the said district court adjourned (*sine die*) for said term and is not now and has not been in session since the 24th day of October, last. That ever since said judgment was rendered your petitioner has been and is now unlawfully restrained of his liberty and confined in the common jail of Kingfisher county, Oklahoma, by M. M. Tate, the duly elected, qualified, and acting sheriff of said county of Kingfisher, under and by virtue of said judgment and sentence, and said sheriff is about to, and will, unless restrained by order of court, unlawfully execute said judgment and sentence by taking and transporting your pe-titioner to said penitentiary as in said judgment ordered.

"That the jury, before whom your petitioner was tried, was selected by order of the judge of said district court from a jury list made and selected by the jury commissioners appointed by an order of the judge of said district court, dated January 6, 1908, according to and in pursuance of an act of the Legis-

lature of the state of Oklahoma, approved December 21, 1907, which act was repealed by the act of said Legislature approved February, 1908, and no jury commissioners were ever appointed under said last-mentioned act by order of said district court or the judge thereof. That the said list from which said trial jury was selected, drawn, summoned, and impaneled was made, returned and filed on the ———day of January, 1908. That after filing his plea and before the jury, before whom your petitioner was tried, was sworn to try said cause, your petitioner challenged said jury panel for the reason that said jury was not selected and drawn as required by law (in accordance with said act of February 21, 1908), and your petitioner was put illegally upon said trial over his protest and objections, all properly made and taken and in proper time.

"That said judgment and sentence is absolutely null and void for the following reasons, to wit: First. That said district court had no jurisdiction to try your petitioner on said information. Second. That the jury before whom your petitioner was tried was illegally selected, drawn, summoned, and impaneled, to try said cause, and said verdict is absolutely null and void. Third. That said district court had no jurisdiction to render said judgment and pass said sentence, and same is cruel, unjust, and absolutely void and contrary to and in violation of the laws and Constitution of the state of Oklahoma and the Constitution of the United States.

"Wherefore your petitioner prays that a writ of *habeas corpus* may issue forthwith requiring the sheriff of Kingfisher county, Oklahoma, to forthwith have and produce the body of your petitioner before this honorable court, and show cause why he is restrained and imprisoned, and that upon the final hearing herein your petitioner may be discharged.

George W. McNaught,<br>
By J. P. Cummings,<br>
F. P. Whistler,<br>
D. K. Cunningham,<br>
His Attorneys."

On December 7, 1908, the writ was allowed as prayed for, by the writer of this opinion, as one of the Judges of the Criminal Court of Appeals, and made returnable December 15, 1908. An order was also made restraining the sheriff from removing petitioner to the penitentiary pending the determination of this

proceeding; and on the 15th day of December, 1908, the return of the sheriff of Kingfisher county was filed in this court, which, omitting the formal parts, is as follows, to wit:

"Comes now M. M. Tate, sheriff of Kingfisher county, Oklahoma, and for his return and answer to the writ served upon him herein, states: That he has not at this time the body of George W. McNaught before this court, for the reason that the production of said body has been waived by a certain instrument of writing, hereto attached, marked 'Exhibit A,' and made a part of this return. Said sheriff further says that he has the body of of said George W. McNaught in his custody by reason of a certain judgment and sentence of the district court of Kingfisher county, Oklahoma, and a commitment issued by said court, and the judgment thereof, in the case of the State of Oklahoma v. George W. McNaught, being the same case described in the petition of applicant herein, which said judgment, sentence, and commitment is hereto attached, marked 'Exhibit B,' and made a part hereof. That on the 21st day of November, 1908, an order was made by the judge of the district court of Kingfisher county, Oklahoma, extending the time within which to make and file a bail bond by said McNaught, for a period of forty (40) days, a copy of which order is hereto attached, marked 'Exhibit C,' and made a part hereof. M. M. Tate."

And said return was verified by the oath of said M M. Tate, sheriff of Kingfisher county, Okla. The attorneys for petitioner also filed a waiver of the presence of the petitioner as follows:

"We, D. K. Cunningham, one of the attorneys of record for petitioner, and M. W. Hinch, county attorney, and Bradley & Bradley, attorneys for the county of Kingfisher, Oklahoma, and Charles West, Attorney General for the state of Oklahoma, M. M. Tate, sheriff of Kingfisher county, Oklahoma, do hereby expressly waive the production of the body of George W. McNaught before the Criminal Court of Appeals at the city of Guthrie, Oklahoma, and the personal appearance of said sheriff, on the return day of the writ issued herein, and also on the hearing of said matter for writ of *habeas corpus* before the said court, and agree that the same may be heard in the absence of said petitioner; and the petitioner hereto agrees that the

hearing herein may be had at Guthrie, Oklahoma, on the 16th day of December, 1908, at 10 o'clock a. m., or as soon thereafter as same can be heard by the court."

On December 22d and 23d, the case was orally argued, briefs filed, and the case submitted.

*D. K. Cunningham, F. P. Whistler,* and *J. P. Cummings,* for petitioner.—

On the legality of prosecuting felonies by information: 8 Cyc. 729, 750 d, 758 e, (4), 760 (6) ; *State v. Ah Jim* (Mont.) 23 Pac. 76; *In re Durbon* (Mont.) 25 Pac. 442.

*M. W. Hinch, Bradley & Bradley, Chas. West,* Atty. Gen. and *W. C. Reeves,* Asst Atty. Gen., for respondent. The brief for respondent did not reach the Reporter.

DOYLE, JUDGE. (after stating the facts as above). The counsel for petitioner at the outset contend that his trial, conviction, and sentence and his restraint is in violation of his rights under the Constitution and the laws of the state of Oklahoma and the Constitution of the United States; that it appears upon the face of the judgment that the petitioner has never been legally or otherwise presented or indicted by a grand jury, and that he was proceeded against by information made, verified, and filed by the county attorney of Kingfisher county after examination and commitment by a magistrate of the said county; that he has been tried and illegally found guilty of manslaughter in the first degree, and that the judgment rendered upon the verdict of the jury in said case was and is void, and, if executed, would deprive the petitioner of his liberty for life without "due process of law," on the ground that the proceedings, as had, are repugnant to the fifth amendment, and that clause of the fourteenth amendment to the Constitution of the United States which is in these words, "Nor shall any state deprive any person of life, liberty or property without due process of law"; and section 7, Bill of Rights, Const. Okla. (Bunn's Ed. § 16), which is as follows: "Section 7. No person shall be deprived of life, liberty, or property ,without due process of law."

At common law the commission of crimes was charged either by indictment or information, depending in most instances upon the grade of the offense. The indictment was an accusation at the suit of the sovereign, based on the oath of 12 men of the county where the offense was committed. 2 Hawk. P. C. 287.

An information was a surmise, or suggestion upon record made on behalf of the sovereign, to a court of criminal jurisdiction, charging a person with a misdemeanor. *U. S. v. Tureaud* (C. C.) 20 Fed. 621.

Informations under the ancient rule were of two kinds: First, such as were merely at the suit of the King; secondly, such as were partly at the suit of the King and partly at the suit of the party. 2 Hawk. P. C. 356.

Blackstone, speaking of criminal informations in discussing the two kinds exhibited in the name of the King, observes: First, those which are truly and properly his own suits, and filed *ex officio* by his own immediate officer, the Attorney General; secondly, those in which, though the King is the common prosecutor, yet it is at the relation of some private person or the common informer, and they are filed by the King's coroner and attorney in the Court of King's Bench, usually called the Master of the Crown Office, who is for this purpose the standing officer of the public.

In the reign of Henry VII. the remedy by information, exhibited by leave of the court by the Master of the Crown Office, became the means of great oppression to the subjects of England, and so continued with little abatement until St. 4 & 5 W. & M. c. 11, § 18, which provided, in effect, that the clerk of the crown, in the court of the King's Bench, should not, without express authority to be given by the court when in session, exhibit, receive, or file any information for any of the causes for which it was allowed, nor issue any process thereon, without taking a recognizance from the person procuring such information to be exhibited; but that the act should not extend to any other information than such as should be exhibited in the Court of

the King's Bench by the Master of the Crown Office.  2 Hawk.
P. C. 358.

Sir James Fitz James Stevens, in his history of the Criminal
Law of England (vol. 1, p. 296), in referring to the act of 1692
regulating informations exhibited by the Master of the Crown
Office, says:

"The practical result of this statute has been to make a
move for a criminal information practically equivalent to a pro-
ceeding before magistrates in order to the committal of the
accused."

This distinguished jurist, on the page of his valuable work
preceding that from which the foregoing excerpt is taken, in re-
ferring to the statute of 1494, 2 Henry VII. c. 3, remarks: "This
act was the one under which Empsom and Dudley earned their
obscure infamy."

Blackstone, alluding to the act last referred to, and also to
another ordained in the reign of the same sovereign, makes the
following statement:

"But when the statute 3 Henry VII, c. 3, had extended the
jurisdiction of the Court of Star Chamber, the members of which
were the sole judges of the law, the fact, and the penalty, and
when the statute Henry VII, c. 3, had permitted informations
to be brought by any informer upon any penal statute, not extend-
ing to life or member, at the assizes, or before justices of the
peace, who were to hear and determine the same according to
their own discretion, then it was that the legal and orderly juris-
diction of the Court of King's Bench fell into disuse and ob-
livion, and Empsom and Dudley (the wicked instruments of
King Henry VII), by hunting out obsolete penalties and this
tyrannical mode of prosecution, with other oppressive devices
continually harrassed the subject and shamefully enriched the
crown." (Blackstone, Com. 310.)

"It was the feeling undoubtedly entertained by the citizens
of this country, that a violation of the rights of personal liberty
as produced in England in the reign of King Henry VII might
possibly be repeated to their injury, that prompted Congress
to propose and secure the adoption of the fifth amendment to
the Constitution of the United States, as this amendment was
never intended to limit the power of the states in respect to

their own people, but was designed to operate on the national government only." (*State v. Guglielmo,* 46 Or. 250, 79 Pac. 577, 80 Pac. 103, 69 L. R. A. 466; *Spies v. Illinios,* 123 U. S. 131, 8 Sup. Ct. 21, 22, 31 L. Ed. 80; *Bolin v. Nebraska,* 176 U. S. 83, 20 Sup. Ct. 287, 44 L. Ed. 382.)

In the case of *Hurtado v. People of California,* 110 U. S. 516, 4 Sup. Ct. 111, 28 L. Ed. 232, the plaintiff in error having been examined and committed for murder, the district attorney informed against him for that crime, and he was convicted and sentenced to death, and the question was whether this was "due process of law." That eminent jurist, Justice Mathews, in delivering the opinion of the court (Justice Harlan alone dissenting), construing a provision of the Constitution of California, adopted in 1879, being article 1, § 8, which provides as follows: "Offenses heretofore required to be prosecuted by indictment shall be prosecuted by information after examination and commitment by a magistrate, or by indictment, with or without such examination and commitment, as may be prescribed by law . A grand jury shall be drawn and summoned at least once a year in each county"—in part says:

"The proposition of law we are asked to affirm is that an indictment or presentment by a grand jury, as known to the common law of England, is essential to that 'due process of law,' when applied to prosecutions for felonies, which is secured and guaranteed by this provision of the Constitution of the United States, and which accordingly it is forbidden to the states respectively to dispense with in the administration of criminal law.

"The question is one of grave and serious import, affecting both private and public rights and interests of great magnitude, and involves a consideration of what additional restrictions upon the legislative policy of the states have been imposed by the fourteenth amendment to the Constitution of the United States.

"The Supreme Court of California, in the judgment now under review, followed its own previous decision in *Kalloch v. Superior Ct.,* 56 Cal. 229, in which the question was deliberately adjudged. Its conclusion was there stated as follows:

" 'This proceeding, as (it) is regulated by the Constitution

and laws of this state, is not opposed to any of the definitions given of the phrases "due process of law" and "the law of the land"; but on the contrary, it is a proceeding strictly within such definitions, as much so in every respect as is a proceeding by indictment. It may be questioned whether the proceeding by indictment secures to the accused any superior rights and privileges; but certainly a prosecution by information takes from him no immunity or protection to which he is entitled under the law.'

"And the opinion cites and relies upon a decision of the Supreme Court of Wisconsin in the case of *Rowan v. State,* 30 Wis. 129, 11 Am. Rep. 559. In that case the court, speaking of the fourteenth amendment, says: 'But its design was not to confine the states to a particular mode of procedure in judicial proceedings for felonies by information instead of by indictment, if they chose to abolish the grand jury system. And the words "due process of law" in the amendment do not mean and have not the effect to limit the powers of state governments to prosecutions for crime by indictment; but these words do mean law in its regular course of administration according to prescribed forms and in accordance with the general rules for the protection of individual rights. Administration and remedial proceedings must change, from time to time, with the advancement of legal science and the progress of society; and if the people of the state find it wise and expedient to abolish the grand jury and prosecute all crimes by information; there is nothing in our state Constitution and nothing in the fourteenth amendment to the Constitution of the United States which prevents them from doing so.'

"On the other hand, it is maintained on behalf of the plaintiff in error that the phrase 'due process of law' is equivalent to 'law of the land,' as found in the twenty-ninth chapter of *Magna Charta;* that, by immemorial usage, it has acquired a fixed, definite and technical meaning; that it refers to and includes not only the general principles of public liberty and private right, which lie at the foundation of all free government, but the very institutions which, venerable by time and custom, have been tried by experience and found fit and necessary for the preservation of those principles, and which, having been the birthright and inheritance of every English subject, crossed the Atlantic with the colonists and were transplanted and established in the fundamental laws of the state; that, having been originally introduced into the Constitution of the United States as a limitation upon the powers of the government, brought into being by that instrument, it has

now been added as an additional security to the individual against oppression by the states themselves; that one of these institutions is that of the grand jury, an indictment or presentment by which is an essential part of due process of law, in order that he may not be harassed and destroyed by prosecutions founded only upon private malice or popular fury.

"This view is certainly supported by the authority of the great name of Chief Justice Shaw and of the court in which he presided, which in *Jones v. Robbins*, 8 Gray (Mass.) 329, decided that the twelfth article of the Bill of Rights of Massachusetts, a transcript of *Magna Charta* in this respect, made an indictment or presentment of a grand jury essential to the validity of a conviction in cases of prosecutions for felonies.

"Chancellor Kent, 2 Com. 13, adopts this mode of construing the phrase. Quoting the language of *Magna Charta* and referring to Lord Coke's comment upon it, he says: 'The better and larger definition of due process of law is that it means law in its regular course of administration through courts of justice.' This accords with what is said in *Westervelt v. Gregg*, 12 N. Y. 202, 62 Am. Dec. 160, by Denio, J. (page 212) : 'The provision was designed to protect the citizen against all mere acts of power, whether flowing from the legislative or executive branches of the government.' The principle and true meaning of the phrase have never been more tersely or accurately stated than by Mr. Justice Johnson, in *Bank v. Okley*, 4 Wheat. 235-244, 4 L. Ed. 559: 'As to the words from *Magna Charta* incorporated into the Constitution of Maryland, after volumes spoken and written with a view to their exposition, the good sense of mankind has at last settled down to this: that they were intended to secure the individual from the arbitrary exercise of the powers of government, unrestrained by the established principles of private right and distributive justice.' And the conclusion rightly deduced is, as stated by Mr. Cooley, Const. Lim. 356: 'The principles, then, upon which the process is based, are to determine whether it is "due process" or not, and not any considerations of mere form. Administrative and remedial process may be changed from time to time, but only with due regard to the landmarks established for the protection of the citizen.'

"It is urged upon us, however, in argument, that the claim made in behalf of the plaintiff in error is supported by the decision of this court in *Murray v. Land & I. Co.*, 18 How. 272, 15 L. Ed. 372. There Mr. Justice Curtis, delivering the opinion of

the court, after showing (18 How. [U. S.] 276, 15 L. Ed. 374) that due process of law must mean something more than the actual existing law of the land, for otherwise it would be no restraint upon legislative power, proceeds as follows: 'To what principle, then, are we to resort to ascertain whether this process, enacted by Congress, is due process? To this the answer must be two-fold. We must examine the Constitution itself to see whether this process be in conflict with any of its provisions. If not found to be so, we must look to those settled usages and modes of proceeding existing in the common and statute law of England before the emigration of our ancestors, and which are shown not to have been unsuited to their civil and political condition by having been acted on by them after the settlement of this country.'

"This, it is argued, furnishes an indispensable test of what constitutes 'due process of law'; that any proceeding otherwise authorized by law, which is not thus sanctioned by usage, or which supersedes and displaces one that is, cannot be regarded as due process of law.

"But this inference is unwarranted. The real syllabus of the passage quoted is that a process of law, which is not otherwise forbidden, must be taken to be due process of law, if it can show the sanction of settled usage both in England and in this country; but it by no means follows that nothing else can be due process of law. The point in the case cited arose in reference to a summary proceeding, questioned on that account, as not due process of law. The answer was: However exceptional it may be, as tested by definitions and principles of ordinary procedure, nevertheless this, in substance, has been immemorially the actual law of the land, and, therefore, is due process of law. But to hold that such a characteristic is essential to due process of law would be to deny every quality of the law but its age, and to render it incapable of progress or improvement. It would be to stamp upon our jurisprudence the unchangeableness attributed to the laws of the Medes and Persians.

"This would be all the more singular and surprising, in this quick and active age, when we consider that, owing to the progressive development of legal ideas and institutions in England, the words of *Magna Charta* stood for very different things at the time of the separation of the American Colonies from what they represented originally. For at first the words, *'Nisi per legale judicium parium,'* had no reference to a jury; they applied only to the *pares regni,* who were the constitutional judges in the

Court of Exchequer and *coram rege*. Bac. Abr. Juries (7th Ed.) Lond. n., Reeve, H. L. 41. And as to the grand jury itself, we learn of its constitution and functions from the Assize of Clarendon, A. D. 1164, and that of Northampton, A. D. 1176, Stubbs, Charters, 143-150.

"The Constitution of the United States was ordained, it is true, by descendants of Englishmen, who inherited the traditions of English law and history; but it was made for an undefined and expanding future, and for a people gathered and to be gathered from many nations and of many tongues. And while we take just pride in the principles and institutions of the common law, we are not to forget that, in lands where other systems of jurisprudence prevail, the ideas and processes of civil justice are also not unknown. Due process of law, in spite of the absolutism of continental governments, is not alien to that Code which survived the Roman Empire as the foundation of modern civilization in Europe, and which has given us that fundamental maxim of distributive justice, *suum cuique tribunere*. There is nothing in *Magna Charta*, rightly construed as a broad charter of public right and law, which ought to exclude the best ideas of all systems and of every age; and, as it was the characteristic principle of the common law to draw its inspiration from every fountain of justice, we are not to assume that the sources of its supply have been exhausted. On the contrary, we should expect that the new and various experiences of our own situation and system will model and shape it into new and not less useful forms.

"The concessions of *Magna Charta* were wrung from the King as guaranties against the oppressions and usurpations of his prerogative. It did not enter into the minds of the barons to provide security against their own body or in favor of the commons by limiting the power of Parliament; so that bills of attainder, *ex post facto* laws, laws declaring forfeitures of estates, and other arbitrary acts of legislation were never regarded as inconsistent with the law of the land; for notwithstanding what was attributed to Lord Coke in *Bonham's Case*, 8 Coke, 115, 118a, the omnipotence of Parliament over the common law was absolute, even against common right and reason. The actual and practical security for English liberty against legislative tyranny was the power of a free public opinion represented by the commons.

"In this country written constitutions were deemed essential to protect the rights and liberties of the people against the encroachments of power and delegated to their governments, and

the provisions of *Magna Charta* were incorporated into bills of rights. They were limitations upon all the powers of government, legislative as well as executive and judicial.

"It necessarily happened, therefore, that, as these broad and general maxims of liberty and justice held in our system a different function from their position and office in English constitutional history and law, they would receive and justify a corresponding and more comprehensive interpretation. Applied in England only as guards against executive usurpation and tyranny, here they have become bulwarks also against arbitrary legislation; but in that application, as it would be incongruous to measure and restrict them by the ancient customary English law, they must be held to guaranty not particular forms of procedure, but the very substance of individual rights to life, liberty, and property. * * *

"Such is the often-repeated doctrine of this court. In *Munn v. Ill.*, 94 U. S. 113-134, 24 L. Ed. 77, the Chief Justice, delivering the opinion of the court, said: 'A person has no property, no vested interest, in any rule of the common law. That is only one of the forms of municipal law, and is no more sacred than any other. Rights of property which have been created by the common law cannot be taken away without due process; but the law itself, as a rule of conduct, may be changed at the will or even at the whim of the Legislature, unless prevented by constitutional limitations. Indeed, the great office of statutes is to remedy defects in the common law as they are developed, and to adapt it to the changes of time and circumstances.' And in *Walker v. Sauvinet*, 92 U. S. 90, 23 L. Ed. 678, the court said: 'A trial by a jury in suits at common law pending in state courts is not, therefore, a privilege or immunity of national citizenship which the states are forbidden by the fourteenth amendment to abridge. A state cannot deprive a person of his property without due process of law; but this does not necessarily imply that all trials in the state courts affecting the property of persons must be by jury. This requirement of the Constitution is met if the trial is had according to the settled course of judicial proceedings. Due process of law is according to the law of the land. This process in the states is regulated by the law of the state.'

"And Mr. Justice Miller, in *Davidson v. N. O.*, 96 U. S. 97, 105, 24 L. Ed. 616, after showing the difficulty if not the impossibility of framing a definition of this constitutional phrase, which should be 'at once perspicuous, comprehensive, and satisfactory,'

and thence deducing the wisdom 'in the ascertaining of the intent and application of such an important phrase in the federal Constitution, by the gradual process of judicial inclusion and exclusion, as the cases presented for decision shall require,' says, however, that 'it is not possible to hold that a party has, without due process of law, been deprived of his property, when, as regards the issues affecting it, he has by the laws of the state a fair trial in a court of justice, according to the modes of proceeding applicable to such a case.' See, also, *Mo. v. Lewis,* 101 U. S. 22-31, 25 L. Ed. 989; *Ex parte Wall,* 107 U. S. 288-290, 2 Sup. Ct. 590, 27 L. Ed. 552.

"We are to construe this phrase in the fourteenth amendment by the *usus loquendi* of the Constitution itself. The same words are contained in the fifth amendment. That article makes specific and express provision for perpetuating the institution of the grand jury, so far as relates to prosecutions, for the more aggravated crimes under the laws of the United States. It declares that 'No person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia when in actual service in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall he be compelled in any criminal case to be a witness against himself.' It then immediately adds, 'nor be deprived of life, liberty or property, without due process of law.' According to a recognized canon of interpretation, especially applicable to formal and solemn instruments of constitutional law, we are forbidden to assume, without clear reason to the contrary, that any part of this most important amendment is superfluous. The natural and obvious inference is that, in the sense of the Constitution, 'due process of law' was not meant or intended to include, *ex vi termini,* the institution and procedure of a grand jury in any case. The conclusion is equally irresistible that, when the same phrase was employed in the fourteenth amendment to restrain the action of the states, it was used in the same sense and with no greater extent; and that if, in the adoption of that amendment, it had been part of its purpose to perpetuate the institution of the grand jury in all the states, it would have embodied, as did the fifth amendment, express declarations to that effect. Due process of law in the latter refers to that law of the land, which derives its authority from the legislative powers conferred upon Congress by the Constitution of the United States, exercised within the limits

therein prescribed, and interpreted according to the principles of the common law. In the fourteenth amendment, by parity of reason, it refers to that law of the land in each state, which derives its authority from the inherent and reserved powers of the state, exerted within the limits of those fundamental principles of liberty and justice which lie at the base of all our civil and political institutions, and the greatest security for which resides in the right of the people to make their own laws, and alter them at their pleasure. 'The fourteenth amendment,' as was said by Mr. Justice Bradley in *Mo. v. Lewis, supra,* 'does not profess to secure all persons in the United States the benefit of the same laws and the same remedies. Great diversities in these respects may exist in two states separated only by an imaginary line. On one side of this line there may be a right of trial by jury, and on the other side no such right. Each state prescribes its own modes of judicial proceeding.'

"But it is not to be supposed that these legislative powers are absolute and despotic, and that the amendment prescribing due process of law is too vague and indefinite to operate as a practical restraint. It is not every act, legislative in form, that is law. Law is something more than mere will exerted as an act of power. It must be not a special rule for a particular person or a particular case, but in the language of Mr. Webster, in his familiar definition, 'The general law, a law which hears before it condemns, which proceeds upon inquiry, and renders judgment only after trial,' so 'that every citizen shall hold his life, liberty, property, and immunities under the protection of the general rules which govern society,' and thus excluding, as not due process of law, acts of attainder, bills of pains, and penalties, acts of confiscation, acts reversing judgments, and acts directly transferring one man's estate to another, legislative judgments and decrees, and other similar special, partial, and arbitrary exertions of power under the forms of legislation Arbitrary power, enforcing its edicts to the injury of the persons and property of its subjects, is not law, whether manifested as the decree of a personal monarch or of an impersonal multitude And the limitations imposed by our constitutional law upon the action of the governments, both state and national, are essential to the preservation of public and private rights, notwithstanding the representative character of our political institutions. The enforcement of these limitations by judicial process is the device of self-governing communities to protect the rights of individuals and minorities, as well against the

power of numbers, as against the violence of public agents, transcending the limits of lawful authority, even when acting in the name and wielding the force of the government. * * *

" 'It must be conceded,' said this court, speaking by Mr. Justice Miller, in *Loan Ass'n. v. Topeka,* 20 Wall. 655-662, 22 L. Ed. 455, 'that there are such rights in every free government beyond the control of the state. A government which recognized no such rights, which held the lives, the liberty, and the property of its citizens subject at all times to the absolute disposition and unlimited control of even the most democratic depository of power, is after all but a despotism. It is true it is a despotism of the many, of the majority, if you choose to call it so, but it is, nevertheless, a depotism. It may be doubted, if a man is to hold all that he is accustomed to call his own, all in which he has placec his happiness and the security of which is essential to that happiness, under the unlimited dominion of others, whether it is not wise that this power should be exercised by one man than by many.'

"It follows that any legal proceeding enforced by public authority, whether sanctioned by age and custom, or newly devised in the discretion of the legislative power, in furthernace of the general public good, which regards and preserves these principles of liberty and justice, must be held to be due process of law.

"The Constitution of Connecticut, adopted in 1818, and in force when the fourteenth amendment took effect, requires an indictment or presentment of a grand jury only in cases where the punishment of the crime charged is death or imprisonment for life, and yet it also declares that no person shall 'be deprived of life, liberty, or property but by due course of law.' It falls short, therefore, of that measure of protection which it is claimed is guaranteed by *Magna Charta* to the right of personal liberty; notwithstanding which it no doubt justly said in Swift's Dig. 17, that: 'That sacred and inestimable right, without which all others are of little value, is enjoyed by the people of this state in as full extent as in any country on the globe, and in as high a degree as is consistent with the nature of civil government. No individual or body of men has a discretionary or arbitrary power to commit any person to prison; no man can be restrained of his liberty, be prevented from removing himself from place to place as he chooses, be compelled to go to a place contrary to his inclination, or be in any way imprisoned or confined, unless by virtue of the express laws of the land.'

"Tried by these principles, we are unable to say that the substitution for a presentment or indictment by a grand jury of the proceeding by information, after examination and commitment, by a magsitrate, certifying to the probable guilt of the defendant, with the right on his part to the aid of counsel, and to the cross-examination of the witnesses produced for the prosecution, is not due process of law. It is, as we have seen, an ancient proceeding at common law, which might include every case of any offense of less grade than a felony, except misprision of treason; and, in every circumstance of its administration, as authorized by the statute of California, it carefully considers and guards the substantial interest of the prisoner. It is merely a preliminary proceeding, and can result in no final judgment, except as the consequence of a regular judicial trial, conducted precisely as in cases of indictments.

"In reference to this mode of proceeding at the common law, and which he says 'is as ancient as the common law itself,' Blackstone adds (4 Com. 305) : 'And as to those offenses in which informations were allowed as well as indictments, so long as they were confined to this high and respectable jurisdiction, and were carried on in a legal and regular course in his Majesty's Court of King's Bench, the subject had no reason to complain. The same notice was given, the same process was issued, the same pleas were allowed, the same trial by jury was had, the same judgment was given by the same judges, as if the prosecution had originally been by indictment.' "

The views expressed in the foregoing case have been approved and followed in a number of subsequent cases, of which the following are a few: *McNulty v. California,* 149 U. S. 645, 13 Sup. Ct. 959, 37 L. Ed. 882; *State v. Miller,* 43 Neb. 860, 62 N. W. 238; *State v. Ayers,* 8 S. D. 517, 67 N. W. 611; *State v. Baldwin,* 15 Wash. 15, 45 Pac. 650; *State v. Sloan,* 65 Wis. 647, 27 N. W. 616; *Bird v. State,* 77 Wis. 276, 45 N. W. 1126; *In re Dolph,* 17 Colo. 35, 28 Pac. 470; *In re Boulter,* 5 Wyo. 329, 40 Pac. 520; *Hodgson v. Vermont,* 168 U. S. 262, 18 Sup Ct. 80, 42 L. Ed. 461; *Ex parte Converse,* 137 U. S. 524, 11 Sup. Ct. 191, 34 L. Ed. 796; *Baldwin v. Kansas,* 129 U. S. 52, 9 Sup. Ct. 193, 32 L. Ed. 640.

Chief Justice Fuller, delivering the opinion of the court in *Ex parte Converse, supra,* in part says:

"It is not our province to inquire whether the conclusion reached and announced by the Supreme Court was or was not correct, and we are not in passing upon its judgment as a court of error, nor can we consider the contention that the decision was not in harmony with the state Constitution and laws (of the state of Michigan). The single question is whether appellant is held in custody in violation of the fourteenth amendment to the Constitution of the United States, in that the state thereby deprives him of liberty without due process of law, and there is no pretense of an abridgment of his privileges and immunities as a citizen of the United States, nor of his denial of the actual protection of the laws; but the state cannot be deemed guilty of a violation of the Constitution of the United States because of a decision, even if erroneous, of its highest court, while acting within its jurisdiction; and, conceding that an unconstitutional conviction and punishment under a valid law would be as violative of a person's constitutional rights as a conviction and punishment under an unconstitutional law, we fail to perceive that the conviction and judgment are repugnant to the constitutional provision. Appellant has been subjected, as all persons within the state of Michigan are, to the law in its regular course of administration, through courts of justice, and it is impossible to hold that a judgment so arrived at is such an unrestricted and arbitrary exercise of power as to be utterly void. We repeat, as has been so often said before, that the fourteenth amendment undoubtedly forbids any arbitrary deprivation of life, liberty, or property, and in the administration of criminal justice requires that no different or higher punishment shall be imposed on one than is imposed on all for like offenses; but it was not designed to interfere with the power of the state to protect the lives, liberty, and property of its citizens, nor with the exercise of that principle, in the adjudication of the courts in the states, in administering the principles provided by the law of the state."

We might well say that in the *Hurtado Case* Justice Mathews' opinion and the dissenting opinion of Justice Harlan contain, pro and con, all that need be said on the great principle involved in the proposition before us; and we must say that the first proposition contended for by the petitioner's counsel has been fully answered by Mr. Justice Mathews and the authorities quoted. The conclusion is irresistible that their first contention is not well taken.

It is further contended by petitioner's counsel that the provision of the Constitution of Oklahoma (section 17 of the Bill of Rights [Bunn's Ed. § 26]) providing for prosecutions by information, is not self-executing, and that section 17 of the Bill of Rights is only a limitation on the Legislature; that it cannot become operative of itself, nor until the enactment by the Legislature of laws defining the details which affect the jurisdiction and limitations of the procedure and the rights and pleadings of the state and the accused, so that the courts may be enabled to carry its provisions into effect, unless otherwise provided for in the Constitution.

A careful analysis of the able, elaborate, and exhaustive arguments, both oral and written, shows that in the end their sole reliance is the decision in the case of *State v. Ah Jim,* 9 Mont. 167, 23 Pac. 76. Chief Justice Blake, rendering the opinion in that case, says:

"There are some provisions of the Constitution which have a direct bearing upon the case at bar, and should be considered. 'No person shall be deprived of life, liberty, or property without due process of law.' Article 3, § 27. 'All criminal laws enacted by the legislative assembly of the territory of Montana, and in force at the time the state shall be admitted into the Union, and not inconsistent with this Constitution, or the Constitution or laws of the United States of America, shall be and remain in full force as the laws of the state until altered or repealed, or until they expire by their own limitation.' Article 20, Schedule, § 1. 'No crime or criminal offense committed against the laws of the territory of Montana shall abate, or in any wise be affected, by reason of the change from a territorial to a state form of government; but the same shall be deemed and taken to be an offense against the laws of the state, and the appropriate courts of the state shall have jurisdiction over, and to hear and determine, the same.' Article 20, Schedule, § 3. 'Prosecutions for criminal offenses against the laws of the territory of Montana, pending at the time the state shall be admitted into the Union, shall not abate; but the same shall continue and be prosecuted in the name of the state of Montana, and the title of every such action shall be changed to conform to this provision.' Article 20, Schedule, § 7. 'Parties who at the time of the admission

of the state into the Union may be confined under the lawful commitments, or otherwise lawfully held to answer for alleged. violations of any of the criminal laws of the territory of Montana, shall continue to be so confined or held until discharged therefrom by the proper courts· of the state.' Article 20, Schedule, § 29. We are aided in giving effect to the foregoing sections of the Schedule by the introductory clause: 'That no inconvenience may arise by reason of changing from a territorial to a state form of government, it is declared as follows.' It is evident that the clause of the Constitution respecting the information does not execute itself."

The real questions before the court in that case were whether the constitutional provision reducing the number of grand jurors required to investigate criminal charges was *ex post facto* in respect to offenses committed before the Constitution was adopted, and whether a prosecution by information could be sustained for a felony committed before the Constitution was adopted.

The same Chief Justice (Blake) rendered the opinion of the court in the case of *State v. Kingsly,* 10 Mont. 537,' 26 Pac. 1066, a well-considered case, the reporter's syllabus of which is:

"Constitutional Law—Prosecution by Information. A conviction in a court of the state for a felony committed in the territory prior to the adoption of the Constitution cannot be sustained where the prosecution was by information, as provided by the Constitution and the act of March 2, 1891, relating thereto, as the provision of the federal Constitution guaranteeing to the accused the right to be prosecuted through the intervention of a grand jury was, at the time of the commission of the offense, the supreme law of the land, and the substitution by the state Constitution of prosecution by information in place of that by indictment, not being a matter affecting the procedure, deprived the accused of a substantial right, and gave said act a retrospective operation"—citing *State v. Ah Jim,* 9 Mont. 167, 23 Pac. 76.

As the information in the *Ah Jim Case* sought to charge an offense committed before statehood, in the territory of Montana, it will be seen that the point relied upon by the counsel was not [the decisive question in that case, and it occurs to us that the]

learned Chief Justice who rendered the opinion failed to give
any sufficient or satisfactory reasons for holding that the clause
of the Montana Constitution respecting prosecutions by infor-
mation for offenses committed after statehood does not execute
itself. He simply gives a literal construction to article 20, Sched-
ule, § 1, as quoted. Judging from the court's opinion in the
*Ah Jim Case,* and the provisions of the Constitution of Montana,
as quoted, the case is clearly distinguished from the case at bar.

The Constitution of Oka'homa provides as follows:

"Art. 2, § 17. No person shall be prosecuted criminally
in courts of record for felony or misdemeanor otherwise than
by presentment or indictment or by information. No person shall
be prosecuted for a felony by information without having had
a preliminary examination before an examining magistrate, or
having waived such preliminary examination. Prosecutions may
be instituted in courts not of record upon a duly verified com-
plaint." (Bunn's Ed. § 26.)

"Id. § 18. A grand jury shall be composed of twelve men,
any nine of whom concurring may find an indictment or true
bill. A grand jury shall be convened upon the order of a judge
of a court having the power to try and determine felonies, upon
his own motion; or such grand jury shall be ordered by such
judge upon the filing of petition therefor, signed by one hun-
dred resident taxpayers of the county; when so assembled such
grand jury shall have power to investigate and return indictments
for all character, and grades of crime, and such other powers
as the Legislature may prescribe. Provided, that the Legislature
may make the calling of a grand jury compulsory." (Bunn s
Ed. § 27.)

"Id. § 20. In all criminal prosecutions, the accused shall
have the right to a speedy and public trial by an impartial jury
of the county in which the crime shall have been committed.
Provided that the venue may be changed to some other county
of the state on the application of the accused, in such manner
as may be prescribed by law. He shall be informed of the
nature and cause of the accusation against him and have a copy
thereof, and be confronted with the witnesses against him, and
have compulsory process for obtaining witnesses in his behalf.
He shall have the right to be heard by himself and counsel, and
in capital cases, at least two days before the case is called for

trial, he shall be furnished with a list of the witnesses that will be called in chief, to prove the allegations of the indictment, or information, together with their post-office addresses." (Bunn's Ed. § 29.)

"Id. § 30. The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches or seizures shall not be violated; and no warrant shall issue but upon probable cause supported by oath or affirmation, describing as particularly as may be the place to be searched and the person or thing to be seized." (Bunn's Ed. § 39.)

"Art. 7, § 19, * * * The style of all writs and processes shall be 'The state of Oklahoma.' All prosecutions shall be carried on in the name and by the authority of the state of Oklahoma. All indictments, informations, and complaints shall conclude, 'Against the peace and dignity of the state.' " (Bunn's Ed. § 192.)

When the foregoing provisions of the Constitution are construed together, it is apparent that the manifest intention of the framers was that they should go into immediate effect. The language employed, in itself, is conclusive that these provisions are self-enforcing. Thus we find that section 17 provides for the prosecution of felonies by information, a preliminary examination having first been had or waived by the accused. It is argued that section 5304, c. 68, Wilson's Rev. & Ann. St. Okla. 1903 (section 168, Code Cr. Proc.), which provides that, "Every felony must be prosecuted by indictment in the district court," has not been repealed or modified, and by virtue of section 2, Schedule, art. 24, of the Constitution (Bunn's Ed. § 451), it is now, the law of this state. This section reads as follows:

"All laws in force in the territory of Oklahoma at the time of the admission of the state into the Union, which are not repugnant to this Constitution, and which are not locally inapplicable shall be extended to, and remain in force in the state of Oklahoma until they expire by their own limitation or are altered or repealed by law."

We believe this territorial law is not only repugnant, but is clearly and unquestionably in direct conflict with, and, as a matter of law, repealed by, section 17. Section 18 provides how a grand

jury shall be organized, and the number necessary to concur in rendering a true bill; by what power and under what conditions it may be convened; defines its power in criminal matters, and provides that other powers may be lawfully prosecuted; and that the Legislature may make the calling of a grand jury compulsory. These sections, 17 and 18, clearly show that the purpose and intent of the framers of the Constitution was that, ordinarily, prosecutions for felonies were to be by information, from the organization of the state, except that in special instances such prosecutions might be by indictment, and that, in prosecutions for crime by indictment or information, both should be concurrent remedies. Section 20 provides that the accused shall be informed of the nature and cause of the accusation against him, and that he shall have a copy thereof, and that in capital cases, at least two days before the case is called, he shall be furnished with a list of the witnesses that will be called in chief to prove the allegations of the indictment or information, showing the intent to have capital cases prosecuted by information. Section 30 provides no warrant shall issue but upon probable cause supported by oath or affirmation. Article 2, § 17 (Bunn's Ed. § 26), provides what the style of a prosecution by information shall be, and what the concluding words must be. These constitutional provisions, together with the provisions of the criminal procedure, chapter 18 of the Code, provide a full and complete system of procedure for the prosecution of all felonies by information.

The various provisions of our criminal procedure, chapter 18, Gen. St. 1908, regulating proceedings before examining and committing magistrates in cases of persons brought before them upon complaint in writing charging the commission of felonies, require that the testimony of the witnesses be reduced to writing, and provide that the accused shall be represented by counsel, and permit cross-examination of the witnesses, and provide that when it appears that a felony has been committed, and that there is probable cause to believe the accused guilty, then that he shall be held to answer. They further provide

that the rule of common law that penal statutes are to be strictly construed has no application to our criminal procedure. This chapter, establishing the law of the state respecting the subjects to which it relates, and its proceedings and all proceaure under it, is to be liberally construed with a view to promoting its objects in furtherance of justice. It further provides that proceedings, practice, and pleadings of the district courts in this state in criminal actions on matters of criminal nature, not specifically provided for in the chapter on criminal procedure, shall be in accordance with the proceedings, practice, and pleadings of the common law. These provisions are as follows:

"Art. 1, § 1889. Magistrate to issue warrant. When an information, verified by oath or affirmation, is laid before a magistrate of the commission, of a public offense, he must, if satisfied therefrom that the offense complained of has been committed, and there is reasonable ground to believe that the defendant has committed it, issue a warrant of arrest."

"Art. 3, § 1935. Duty of magistrate. When the defendant is brought before a magistrate upon an arrest, either with or without a warrant, on a charge of having committed a public offense, the magistrate must immediately inform him of the charge against him, and of his right to the aid of counsel in every stage of the proceedings, and also of his right to waive an examination before any further proceedings are had." (St. 1890, § 5433.)

"Art. 3, § 1936. Defendant allowed counsel. He must also allow the defendant a reasonable time to send for counsel, and adjourn the examination for that purpose; and must upon the request of the defendant require a peace officer to take a message to such counsel in the county or city as the defendant may name. The officer must, without delay, perform that duty, and shall receive fees therefor as upon service of a subpoena: Provided, however that at any time before the examination is begun, a change of venue may be had, for the same causes and in the same manner, and be transmitted to another justice, as in cases finally triable before a justice of the peace."

"Art. 3, § 1941. Duty of magistrate on examination. At the examination the magistrate must, in the first place, read to the defendant the information on file before him. He must also,

after the commencement of the prosecution, issue subpoenas for any witnesses required by the prosecutor or the defendant."

"Art. 3, § 1944.  Magistrate must keep deposition.  The magistrate or his clerk must keep the depositions taken on the examination, and the statement of the defendant, until they are returned to the proper court, and must not permit them to be inspected by any person except a judge of a court having jurisdiction of the offense, the district attorney of the county, and the defendant and his counsel.  A violation of this section is a misdemeanor."

"Art. 4, § 1960.  Verified by county attorney.  The county attorney shall subscribe his name to informations filed in the county or district court and indorse thereon the names of the witnesses known to him at the time of filing the same, and the names of such other witnesses as may afterwards become known to him, at such time before the trial as the court may by rule prescribe.  All informations shall be verified by oath."

It is a matter of common knowledge that there is a wide difference of opinion among the district judges and the bench, and the bar of the state generally, as to whether these provisions of the Constitution, above referred to, are self-executing, or whether they require legislation to become effective, and as to and whether or not felonies committed since statehood may be prosecuted by information as well as indictment, and whether under these provisions of the Constitution grand juries can only be convened upon order of a judge of a court having power to try and determine felonies upon his own motion, or upon a petition signed by 100 taxpayers of the county.  Mindful of the fact that this case involves those fundamental rights over which the English-speaking people have waged their greatest battle for liberty, it is also well to remember that we have had a long session of the Legislature, whose greatest duty was to pass laws where needed to put the provisions of our Constitution in force, with a membership largely composed of ex-members of the constitutional convention, the personnel of which included many of the leading lawyers of the state.  Yet no law was presented in relation to this subject.  Under the well-settled rule that the constitutional provisions that are prohibitory are self-enforcing,

the test being, can the provisions be enforced without the aid of legislation, the question arises, was the language of this provision (section 17 of the Bill of Rights [Bunn's Ed. § 26]) addressed to the courts or to the Legislature? We believe that it was addressed to the courts.

After a careful research, and a full consideration of all the authorities submitted, in connection with the provisions of our Constitution and laws, we are of the opinion that since the organization of the state (November 16, 1907) the prosecution of felonies by indictment and information have been, and are now, concurrent remedies. We are fully satisfied that the framers of our Constitution intended to abolish the grand jury system, except that it might be invoked for those special purposes, such as the investigation of public officers, the failure of public prosecutors to do their duty, and those peculiar conditions of public disorder which sometimes arise and make prosecutions by information impracticable. We also believe that it was intended that these provisions of the Constitution should become operative from the beginning of statehood.

They are sufficient to be self-executing under any and all accepted rules of construction, and, if there is any doubt about the proposition, it is settled by the rules of construction enunciated and quoted by our Supreme Court, in the case of *Ex parte Cain,* 20 Okla. 125, 93 Pac. 974, opinion of the court by Chief Justice Williams, wherein he says:

"The rules of construction should be so applied to written constitutions as to give effect, if possible, to the intent of the framers, and of the people who have adopted it, and to promote the objects for which the same was framed and adopted. But it may be contended, if we adopt the literal words of this provision, that whilst it is stated that the same shall be immediately enforceable, yet we find no maximum punishment provided, and that consequently the same is not a complete criminal statute without such definite provisions, and that, therefore, it is not enforceable without additional legislation to give it effect. A statute providing a minimum without fixing the maximum punishment is neither invalid as being in violation of section 9, art. 2, of our

Constitution, nor as being too vague and indefinite to be enforced, at least as to the minimum punishment, which is valid without additional enactments. *State v. Fackler,* 91 Wis. 419, 64 N. W. 1029; *State v. Williams,* 77 Mo. 310. Hence it is not necessary, in considering as to whether or not said provision is self-executing, to determine as to whether or not punishment in excess of 30 days' imprisonment and $50 fine under said prohibition provision incorporated in our Constitution, without further legislation, could be imposed; for, having determined that said prohibitory provision prescribed an enforceable minimum punishment, we necessarily conclude that said provision, as it appears in said Constitution, is self-executing. Section 13 of the Enabling Act (Act June 16, 1906, c. 3335, 34 Stat. 275 [U. S. Comp. St. Supp. 1907, p. 149]) provides as follows: 'That said state, when admitted as aforesaid, shall constitute * * *; and that the laws in force in the territory of Oklahoma, as far as applicable, shall extend over and apply to said state until changed by the Legislature thereof.' Also section 2 of the Schedule of the Constitution reads as follows: 'All laws in force in the territory of Oklahoma at the time of the admission of the state into the Union which are not repugnant to this Constitution and which are not locally inapplicable shall be extended to and remain in force in the state of Oklahoma until they expire by their own limitation or are altered or repealed by law.' "

And we are also upheld in our conclusion by the Supreme Court of the state of Missouri, in the case of *State v. Kyle,* 166 Mo. 287, 65 S. W. 763, 56 L. R. A. 120. Section 12, art. 2, of the Constitution of the state of Missouri, which originally provided for the prosecution of felonies by indictment only, was amended by resolution of the Legislature, which, having been adopted by the vote of the people, took effect December, 1900, substituting the following in lieu of the former clause, to wit:

"No person shall be prosecuted criminally for felonies or misdemeanors otherwise than by indictment or information, which shall be concurrent remedies; but this shall not be construed to apply to cases arising in the land or naval forces, or in the militia when in actual service in time of war or public danger."

One of the questions before the court in that case was whether the amendment in question was self-executing or not.

Chief Justice Burgess, delivering the opinion of the court, says:

"Was the amendment in question self-operating from the time it took effect? It pertains to criminal procedure, and is prohibitory in character, and it is well settled that all such clauses in a Constitution are self-enforcing. *St. Joe Bd.. of Public Schools v. Patten,* 62 Mo. 444; *Householder v. Kansas City,* 83 Mo. 488; *Hickman v. Kansas,* 120 Mo. 110, 25 S. W. 225, 23 L. R. A. 658, 41 Am. St. Rep. 684. There are a number of provisions in the Constitution of this state that are unquestionably self-executing, and require no legislation to put them in operation. The test in such cases is, Can the Constitution, as amended, be enforced without the aid of legislation? 'The question in every case is whether the language of a constitutional provision is addressed to the courts or the Legislature. Does it indicate that it was intended as a present enactment, complete in itself as definite legislation? or does it contemplate subsequent legislation to carry it into effect? This is to be determined from a consideration both of the language used and of the intrinsic nature of the provision itself. If the nature and extent of the right conferred and of the liability imposed are fixed by the provision itself, so that they can be determined by the examination and construction of its own 'terms, and there is no language used indicating that the subject is referred to the Legislature for action, then the provision should be construed as self-executing, and it is language addressed to the courts.' *Willis v. Mabon, sub nom. Willis v. St. Paul Sanitation Co.,* 48 Minn. 140, 50 N. W. 1110, 16 L. R. A. 281, 31 Am. St. Rep. 626. There is nothing in the language used in the amendment which indicates that subsequent legislation was necessary or intended to carry it into effect; nor was it, as it simply prohibits any other mode for the prosecution of felonies (except certain cases, as therein provided) otherwise than by indictment or information. The case of *Fuss v. Spaunhorst,* 67 Mo. 256, is distinguishable from the one at bar, in that the section of the Constitution under which that case arose declared that it should be a crime, the nature and punishment of which shall be prescribed by law, clearly indicating that subsequent legislation was in the minds of the lawmakers necessary to carry it into effect, while no such intimation is to be found in the amendment in question, nor can it be inferred from the language used.

"The terms 'information' and 'indictment,' as used in the Constitution, have reference to and are to be understood in their

common-law sense. *Ex parte Slater,* 72 Mo. 102; *State v. Kelm,* 79 Mo. 515. In the *Kelm Case* it was held that the term 'information,' as used in article 2, § 12, of the state Constitution of 1875, was to be understood in its common-law sense; that is, a criminal charge, which at common law is presented by the Attorney General, or, if that office is vacant, then by the Solicitor General of England, and in this state by the prosecuting attorneys of the respective counties who exercise the same powers as are exercised by the Attorney General or Solicitor General of England; that is, the power to present informations under their official oaths. * * *

"As there was no statute in this state, at the time the constitutional amendment went into effect, prescribing the mode of procedure by information in the prosecution of felonies in the courts of record in this state, and as the information therein meant is to be understood in its common-law sense—that is, a criminal charge exhibited by the Attorney General or other proper officer—we must look to that law for light upon the subject. The common-law information was an accusation of a criminal character, exhibited against a person charging him or her with a criminal offense, by the Attorney General or the Solicitor General, and under his oath of office. Bishop says: 'The criminal information should be deemed to be such, and such only, as in England is presented by the Attorney or Solicitor General. This part of the English common law has plainly become ours. And as, with us, the powers which in England are exercised by the Attorney General and the Solicitor General are largely distributed among our district attorneys, whose office does not exist in England, they would seem to be entitled, under our common law, to prosecute by information, as a right adhering to their office, and without leave of court.' 1 Bishop, New Crim. Proc. (4th Ed.) § 144."

In the case of *Davis v. Burke,* 179 U. S. 399, 21 Sup. Ct. 210, 45 L. Ed. 249, said case being where the petitioner, Davis, having been informed against by the county attorney of Cassia county, Idaho, was tried, convicted, and sentenced to be hanged, Mr. Justice Brown, delivering the opinion of the court, says the question is:

"First, whether the petitioner was legally prosecuted by information? The Constitution of Idaho contains the following clause: 'Art. 1 § 8. No person shall be held to answer for any

felony or criminal offense of any grade, unless on presentment or indictment of a grand jury, or on information of the public prosecutor, after a commitment by a magistrate.' But we ·are also of opinion that for the purposes of this case the provision of the Idaho Constitution must be deemed self-executing. The rule is thus stated by Judge Cooley in his work upon Constitutional Limitations (page 99) : 'A constitutional provision may be said to be self-executing if it supplies a sufficient. rule by means ol which the right given may be enjoyed and protected, or the duty imposed may be enforced; and it is not self-executing when it merely indicates principles, without laying down rules ·by means of which those principles may be given the force of law. Thus, a Constitution may very clearly require county and ·town government; but if it fails to indicate its range, and to provide proper machinery, it is not in this particular self-executing, and legislation is essential.' When a constitutional provision is complete in itself, it needs no further legislation to put ·it in force. When it lays down certain general principles, as to enact laws upon a certain subject, or for the incorporation of cities of certain population, or for uniform laws upon the subject of taxation, it may need more specific legislation to make it operative. In other words, it is susceptible of execution. But where a Constitution asserts a certain right, or lays down a certain principle of law or procedure, it speaks for the entire people as their supreme law, and is full authority for all that is done in pursuance of its provisions. In short, if complete in itself, it executes itself. When a Constitution declares that felonies may be prosecuted by infor- mation after a commitment by a magistrate, we understand exactly what is meant, since informations for the prosecution of minor offenses are said by Blackstone to be as old as the com- mon law itself, and a proceeding before magistrates for the ap- prehension and commitment of persons charged¹ with crime has been the usual method of procedure since the adoption of the Constitution. It is true the Legislature may see fit to pre- scribe in detail the method of procedure, and the law enacted by it may turn out to be defective by reason of irregularity in its passage. In such case a proceeding by information might be impeached in the state court for such irregularity, but it cer· tainly would not be void so long as it was authorized by the Constitution. For us to say that the accused had been denied due process of law would involve the absurdity of holding that what the people had declared to be the law was not the law."

These authorities are conclusive that the provisions of our Constitution relating to prosecutions by information are self-enacting, self-operating, self-enforcing, and self-executing, and in this case we so hold.

It is next contended by counsel for petitioner that:

"Second. That the trial jury was not legally selected, drawn, summoned, and impaneled as required by law; and that, as petitioner was tried and convicted by a jury so illegally selected, said jury had no jurisdiction to sit as a trial jury and its verdict is wholly void."

We are of opinion that the manner and method of selecting the trial jury is not a question that can be reviewed in a *habeas corpus* proceeding. Section 2411, Gen. St. 1908, provides:

"Sec. 2411. When Not Discharged. No court or judge shall inquire into the legality of any judgment or process whereby the party is in custody, or discharge him when the term of commitment has not expired, in either of the cases following. * * * (2) Upon any process issued on any final judgment of a court of competent jurisdiction. * * * (4) Upon a warrant or commitment issued from the district court, or any other court of competent jurisdiction, upon an indictment or information."

Many states have similar statutes providing that the prisoner shall not be discharged under a writ of *habeas corpus* where it appears that he is held in custody by virtue of a judgment of a court of competent jurisdiction, and appellate courts uniformly hold that the writ of *habeas corpus* is not to take the place of a writ of error or the appeal. *Ex parte Patman*, 20 Okla. 846, 95 Pac. 622; *Ex parte Johnson* (Okla. Cr. App.) *ante*, p—, 97 Pac. 1023; *In re Johnson* (Okla. Cr. App.) *ante*, p.—, 98 Pac. 461. Disobeying the law, or a failure to comply with the provisions of the law governing the selection of a petit jury, does not so affect the jurisdiction of the court as to justify the release by *habeas corpus* of a person convicted upon a trial had by a jury so illegally selected. It is unnecessary for us to consider whether the jury was properly or illegally impaneled, as it is a matter that does not go to the jurisdiction of the court.

The next and last proposition contended for by counsel for petitioner is: "Third. That the judgment is void, for the reason

it is cruel, unjust, and excessive." As the question of punishment is for the Legislature to fix, the Criminal Code of Oklahoma provides:

"Whenever any person is declared punishable for a crime by imprisonment in the state prison for a term of not less than any specified number of years, and no limit to the duration of such imprisonment, the court authorized to pronounce judgment upon such a conviction may, in its discretion sentence such offender to imprisonment during his natural life, or for any number of years not less than such as are prescribed."

Under section 2411, Gen. St. 1908, above quoted, a judgment by a district court, valid on its face, is an unanswerable return to a writ of *habeas corpus,* instituted for the release of a prisoner by virtue of such judgment. The court having fixed the maximum punishment permissible under the law, it is not for this court to review on a proceeding in *habeas corpus* the question as to whether or not the sentence imposed is cruel, excessive, and unjust, this being a question that could only be reviewed upon appeal. If the vice of the judgment and sentence relied on is that it is cruel, unjust, and excessive in character, as in this case, and not that it is of an entirely different character from that authorized by law, the writ will be denied and the prisoner remanded. Where an appeal or other direct method for the correction of errors in a judgment is provided for, as in our laws, that procedure must be followed.

Our conclusion is that the district court of Kingfisher county had jurisdiction under the information, as filed in this case, of the person and of the subject-matter of the prosecution, and said court did not, in the proceedings had, exceed its jurisdiction, and that irregularities, if any, occurring in the trial of the case, did not affect the validity of its final judgment. We are of opinion that the petitioner is not unlawfully restrained of his liberty, and that respondent, the sheriff of Kingfisher county, properly and legally holds said petitioner.

The writ of *habeas corpus* is therefore discharged, and the petitioner, George W. McNaught, is hereby remanded to the custody of the sheriff of said county, state of Oklahoma.

FURMAN, Presiding Judge, and BAKER, Judge, concur.